[No. B163112. Second Dist., Div. Eight. July 16, 2004.]

CAL EWING et al., Plaintiffs and Appellants, v.
DAVID GOLDSTEIN, Defendant and Respondent.

808

**COUNSEL**

Stark, Rasak & Clarke and Edmund Willcox Clarke, Jr., for Plaintiffs and Appellants.

Callahan, McCune & Willis and Christopher J. Zopatti for Defendant and Respondent.

**OPINION**

**BOLAND, J.—**

### SUMMARY

The parents of a victim killed by a therapist's patient sued the therapist for wrongful death based on the therapist's failure to warn the victim after the therapist received a communication that the patient threatened to kill or cause serious physical harm to the victim. The trial court granted the therapist's motion for summary judgment on the ground he was immune from liability under Civil Code section 43.92[1] because the threat was communicated to the therapist by the patient's father rather than by the patient himself.

---

[1] All undesignated statutory references are to this code.

■ We conclude the trial court too narrowly construed section 43.92. First, a communication from a family member to a therapist, made for the purpose of advancing a patient's therapy, is a "patient communication" within the meaning of section 43.92. Second, a therapist's duty to warn a victim arises if the information communicated leads the therapist to believe or predict that the patient poses a serious risk of grave bodily injury to another.

Summary judgment was erroneously granted inasmuch as the communication to the therapist by a member of the patient's family of the patient's threat to kill or cause grave bodily injury to the victim raised a triable issue concerning the therapist's duty to warn the victim.

## FACTUAL AND PROCEDURAL BACKGROUND

Respondent Dr. David Goldstein is a marriage and family therapist. Between 1997 and June 2001, Goldstein provided personal therapeutic services to Geno Colello, a former member of the Los Angeles Police Department. Goldstein treated Colello for work-related emotional problems and problems concerning his former girlfriend, Diana Williams.

Beginning in early 2001, Colello became increasingly depressed and despondent over the termination of his relationship with Williams. Colello's feelings of depression significantly increased in mid-June, after learning of her romantic involvement with another man.

Goldstein last met with Colello at his office on June 19, 2001.[2] Goldstein spoke with Colello on the telephone on June 20, and again on June 21, when he asked Colello if he was feeling suicidal. Colello "was not blatantly suicidal, but did admit to thinking about it." Goldstein asked Colello to consider checking himself into a psychiatric hospital, and also sought and obtained Colello's permission to speak with his father, Victor Colello.

Colello had dinner with his parents on June 21. He was extremely depressed. Colello talked to his father about how he had lost the desire to live, and about his building resentment toward Williams's new boyfriend. He told his father "he couldn't handle the fact that [Williams] was going with someone else," and said he "was considering causing harm to the young man that [Williams] was seeing." Colello's father contacted Goldstein and told

---

[2] Unless otherwise indicated, all date references are to calendar year 2001.

him what Colello had said. Goldstein urged Colello's father to take Colello to Northridge Hospital Medical Center, where Goldstein arranged for him to receive psychiatric care. Colello was voluntarily admitted the evening of June 21, under the care of Dr. Gary Levinson, a staff psychiatrist.[3]

On June 22, Levinson told Colello's father he planned to discharge Colello. Concerned that his son was being released prematurely, Colello's father called Goldstein. Goldstein contacted Levinson, with whom he had not yet spoken, and explained why Colello should remain hospitalized. Levinson told Goldstein that Colello was not suicidal and would be discharged. Goldstein urged Levinson to reevaluate Colello and keep him hospitalized through the weekend. He did not do so.

Colello was discharged on June 22. Goldstein had no further contact with his patient. On June 23, Colello murdered Williams's new boyfriend, Keith Ewing, and then committed suicide.

Keith's parents, Cal and Janet Ewing, sued Goldstein for wrongful death based on professional negligence. The Ewings alleged Colello posed a foreseeable danger to their son, and had directly or indirectly through third persons communicated to Goldstein his intention to kill or cause serious physical harm to him. They alleged Goldstein failed to discharge his duty to warn their son or a law enforcement agency of the risk of harm his patient posed to their son's safety.

Goldstein moved for summary judgment. He argued the Ewings' action was barred by section 43.92, which immunizes a psychotherapist for failing to warn of, protect against or predict a patient's violent behavior except in cases where "the patient has communicated to the psychotherapist a serious threat of physical violence against a reasonably identifiable victim or victims."[4] (§ 43.92, subd. (a).) Goldstein argued he could not be liable for failing to alert the police and the Ewings' son to the danger posed by Colello because Colello had never directly disclosed to him an intention to seriously harm the Ewings' son, whose surname Colello never revealed.

The Ewings opposed the motion. They argued the evidence showed that, by virtue of Colello's statements to Goldstein, his interactions with him and

---

[3] Both Levinson and the hospital are or were defendants in this action. Levinson is not involved in this appeal. The hospital is a party to a separate, pending appeal in this action. Colello's parents, Victor and Anita Colello, are also defendants in this action but are not involved in this appeal.

[4] As a licensed marriage and family therapist, Goldstein is considered a "psychotherapist," as that term is statutorily defined. (See Evid. Code, § 1010, subd. (e), and Civ. Code, § 43.92, subd. (a).)

the information his father conveyed to Goldstein, the therapist was aware of the threat of harm Colello posed to the Ewings' son, who was readily identifiable. They argued summary judgment was inappropriate, because there were material factual disputes regarding the extent to which Goldstein was aware of the danger his patient posed to the Ewings' son, and whether the information given or made available to Goldstein constituted a "communication" to him of Colello's intent to kill or injure their son.

The trial court found the Ewings had failed to satisfy the statutory requirements necessary to defeat the psychotherapist's immunity, because "the patient himself" had not communicated the threat to the therapist. The court also found the information in Goldstein's possession did not rise to the level of the "serious threat of physical violence" required to trigger psychotherapist liability. The motion was granted and judgment entered. The Ewings appeal.[5]

## DISCUSSION

The Ewings make two primary contentions on appeal. First, they assert the trial court misinterpreted section 43.92, when it found that the serious threat of violence which triggers a therapist's duty to warn may only come directly from "the patient himself." Second, they insist disputed factual issues preclude summary judgment. We agree.

1. *The trial court's construction of Civil Code section 43.92 was unduly narrow.*

Section 43.92, subdivision (a) provides: "There shall be no monetary liability on the part of, and no cause of action shall arise against, any . . . psychotherapist . . . in failing to warn of and protect from a patient's threatened violent behavior or failing to predict and warn of and protect from a patient's violent behavior except where the patient has communicated to the psychotherapist a serious threat of physical violence against a reasonably identifiable victim or victims."[6] The Ewings insist § 43.92 is hopelessly ambiguous and must be invalidated. We disagree.

---

[5] The Ewings prematurely filed a notice of appeal after the court issued its minute order, but before the signed order was entered. Under California Rules of Court, rule 2(d)(1), we exercise our discretion to treat the appeal as taken from the November 27, 2002, judgment and order granting summary judgment.

[6] If a psychotherapist has a duty to warn, the duty is discharged once he or she makes a reasonable effort to communicate the threat to the intended victim and a law enforcement agency. (§ 43.92, subd. (b).)

Section 43.92 does contain certain facial ambiguities. However, once the statute's legislative history and the evils it sought to remedy are considered, we conclude the ambiguities are not fatal and the statute can easily be read to effect its purpose.

a. *A communication from a patient's family member to the patient's therapist, made for the purpose of advancing the patient's therapy, is a "patient communication" within the meaning of section 43.92.*

The rules of statutory construction are well established. The primary objective in construing a statute is to ascertain and effectuate the underlying legislative intent. "We begin by examining the statutory language because it generally is the most reliable indicator of legislative intent. [Citation.] We give the language its usual and ordinary meaning, and '[i]f there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language governs.' [Citation.]" (*Allen v. Sully-Miller Contracting Co.* (2002) 28 Cal.4th 222, 227 [120 Cal.Rptr.2d 795, 47 P.3d 639].) However, if the statutory language is reasonably susceptible to more than one meaning, we look to extrinsic sources in an effort to discern the intended meaning. (*Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 775 [72 Cal.Rptr.2d 624, 952 P.2d 641].) "Ultimately we choose the construction that comports most closely with the apparent intent of the lawmakers, with a view to promoting rather than defeating the general purpose of the statute." (*Allen, supra,* 28 Cal.4th at p. 227.)[7]

(1) *Historical context of enactment of Section 43.92.*

Section 43.92 refers only to a patient's communication to his or her psychotherapist. A "patient" is defined as "a person who consults a psychotherapist or submits to an examination by a psychotherapist for the purpose of securing a diagnosis or preventive, palliative, or curative treatment of his mental or emotional condition . . . ." (Evid. Code, § 1011.) Read literally, section 43.92 would preclude the imposition of liability if information about the patient's violent intentions, regardless of the credibility of the information, were received by a therapist from any source other than the patient. The

---

[7] Goldstein refers to portions of the legislative history of section 43.92, but has not formally requested judicial notice of material outside the record. As required, the parties have been afforded an opportunity to present information relevant to the tenor and propriety of taking judicial notice of the legislative history of section 43.92. (Evid. Code, §§ 455, subd. (a), 459, subds. (a), (c).) On our own accord, judicial notice is taken of portions of the legislative history of section 43.92 specified in the text. (See Evid. Code, §§ 452, subd. (h), 459, subd. (a); *Schmidt v. Southern Cal. Rapid Transit Dist.* (1993) 14 Cal.App.4th 23, 30, fn. 10 [17 Cal.Rptr.2d 340] ["In a search to discern legislative intent, an appellate court is entitled to take judicial notice of the various legislative materials, including committee reports, underlying the enactment of a statute."].)

trial court construed the statute in that manner. However, the rule of reason and a review of the circumstances which lead to the enactment of section 43.92 militate strongly against such a restrictive interpretation.

Section 43.92 was enacted in response to the Supreme Court's decisions in *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334] (*Tarasoff*), and *Hedlund v. Superior Court* (1983) 34 Cal.3d 695 [194 Cal.Rptr. 805, 669 P.2d 41] (*Hedlund*).

In *Tarasoff*, a patient confided to his psychotherapist his intent to kill an unnamed but readily identifiable girl. The therapist notified campus police and requested the patient's involuntary commitment for observation in a mental hospital. Due to his rational appearance and promise to stay away from the girl, the police released the patient. Despite his promise, the patient killed the girl. The girl's parents sued the patient's therapist for wrongful death for failure to warn them or their daughter about the danger his patient presented. (*Tarasoff, supra,* 17 Cal.3d at pp. 432–433.) The trial court sustained the therapist's demurrer without leave to amend. The Supreme Court reversed, rejecting the therapist's contention that he owed no duty to the girl because she was not his patient. It held that "once a therapist does in fact determine, or under applicable professional standards reasonably should have determined, that a patient poses a serious danger of violence to others, he bears a duty to exercise reasonable care to protect the foreseeable victim of that danger." (*Id.* at pp. 431, 439.) Depending on the nature of the case, the therapist's duty may include notifying the police, or warning the intended victim or others likely to apprise the victim of the danger. (*Id.* at p. 431.)

In *Hedlund,* the child of a woman shot by a psychologist's patient sued for emotional injuries suffered after a therapist failed to warn him of a known threat against his mother. The child, who was seated next to his mother when she was shot, asserted the therapist owed him a duty on the theory it was foreseeable he would be injured if the patient's threats materialized. (*Hedlund, supra,* 34 Cal.3d at p. 705.) The Supreme Court agreed. It held that a therapist's duty to warn potential victims of a patient's threatened violence extends "to persons in close relationship to the object of a patient's threat . . . ." (*Id.* at p. 706.)

Assembly Bill No. 1133 was introduced in response to these decisions and in recognition of the problems posed to the mental health profession if therapists were required to predict a patient's violence.[8] The resulting statutory provision, section 43.92, was not intended to overrule *Tarasoff* or

---

[8] In his concurring and dissenting opinion in *Tarasoff,* Justice Mosk pointed to what one scholar has characterized as "[t]he hardships fora therapists of trying to negotiate a safe passage between the Scylla of unjustified disclosure and the Charybdis of failure to warn" created by the majority's broad rule. (Merton, *Confidentiality and the 'Dangerous' Patient:*

*Hedlund,* "but rather to limit the psychotherapists' liability for failure to warn to those circumstances where the patient has communicated an 'actual threat of violence against an identified victim', and to 'abolish the expansive rulings of *Tarasoff* and *Hedlund* . . . that a therapist can be held liable for the mere failure to predict and warn of potential violence by his patient.' " (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1133 (1985–1986 Reg. Sess.), May 14, 1985.)[9]

Section 43.92 represents a legislative effort to strike an appropriate balance between conflicting policy interests. On the one hand, the need to preserve a patient confidence recognizes that effective diagnosis and treatment of a mental illness or an emotional problem is severely undermined when a patient cannot be assured that a statement made in the privacy of his therapist's office will not be revealed. On the other hand is the recognition that, under limited circumstances, preserving a confidence is less important than protecting the safety of someone whom the patient intends to harm.

The preservation of a patient confidence—even when that confidence includes an expression of violent intentions—is a fundamental tenet of psychotherapy. As the Supreme Court cautioned in *Tarasoff,* "the open and confidential character of psychotherapeutic dialogue encourages patients to

---

*Implications of Tarasoff for Psychiatrists and Lawyers,* (1982) 31 Emory L.J. 263, 295.) By creating a duty to warn not just where a psychotherapist had actually predicted a patient's violence, but also where other practitioners, adhering to the standard of the mental health profession, would have done so, Justice Mosk feared the court had taken the profession "from the world of reality into the wonderland of clairvoyance." (*Tarasoff, supra,* 17 Cal.3d at p. 452 (conc. & dis. opn. of Mosk, J.).)

Justice Mosk addressed the issue again in a dissenting opinion in *Hedlund,* where he pointed to a substantial body of literature demonstrating the inherent unreliability of psychiatric predictions of violence. (*Hedlund, supra,* 34 Cal.3d at pp. 707–710.) He noted another significant hazard of the *Tarasoff* standard was that it encouraged the breach of a necessarily confidential relationship and placed subtle pressure on mental health practitioners to play it safe and resolve doubts in favor of predictions of dangerousness. It further encouraged practitioners to lock up their patients and warn others of the danger that a patient may, but in reality probably did not, present, even at the risk of effective therapy. (*Id.* at pp. 709–710, fn. 1, citation omitted.)

[9] One court has found that section 43.92 codified, rather than limited, the rule in *Tarasoff.* (See *Tilley v. Schulte* (1999) 70 Cal.App.4th 79, 85 [82 Cal.Rptr.2d 497].) We respectfully disagree. Although both *Tarasoff* and *Hedlund* involved factual situations in which the therapists had actual knowledge of the patient's harmful intentions, the Supreme Court went further and held that liability may attach in a case in which a therapist should have determined his patient presented a grave risk to another. (*Tarasoff, supra,* 17 Cal.3d at p. 431; *Hedlund, supra,* 34 Cal.3d at pp. 705–707.) Section 43.92, on the other hand, eliminates the "should have determined" component and provides immunity to therapists for failure to warn, except where the plaintiff can show that the patient actually communicated to his therapist a serious threat of physical violence against an identifiable victim. (§ 43.92, subd. (a); see also *Barry v. Turek* (1990) 218 Cal.App.3d 1241, 1244 [267 Cal.Rptr. 553], fn. omitted. ["Section 43.92, subdivision (a) was enacted to limit the liability of psychotherapists under *Tarasoff* . . ."].)

express threats of violence, few of which are ever executed. Certainly a therapist should not be encouraged routinely to reveal such threats; such disclosures could seriously disrupt the patient's relationship with his [or her] therapist and with the persons threatened. To the contrary, the therapist's obligations to his [or her] patient require that he [or she] not disclose a confidence unless such disclosure is necessary to avert danger to others . . . ." (*Tarasoff, supra,* 17 Cal.3d at p. 441.)

Balanced against the interest in preserving a patient confidence is the Legislature's recognition that privacy interests must yield when, in the therapist's professional opinion, the disclosure of a patient confidence is necessary to avert serious physical harm to another. Section 43.92 strikes a reasonable balance in that it does not compel the therapist to predict the dangerousness of a patient. Instead, it requires the therapist to attempt to protect a victim under limited circumstances, even though the therapist's disclosure of a patient confidence will potentially disrupt or destroy the patient's trust in the therapist. However, the requirement is imposed upon the therapist only after he or she determines that the patient has made a credible threat of serious physical violence against a person. Stated differently, otherwise confidential information conveyed to a therapist loses its "protected" status once it provides the reasonable cause for the therapist to believe the patient presents a significant danger to himself, herself or others. (Cf. Evid. Code, § 1024 ["There is no privilege . . . if the psychotherapist has reasonable cause to believe that the patient is in such mental or emotional condition as to be dangerous to himself or to the person or property of another and that disclosure of the communication is necessary to prevent the threatened danger."].)

### (2) *Application to statements by family members.*

Against this backdrop, we turn to the question presented. If information about the serious threat of grave bodily injury is brought to the therapist's attention through a member of the patient's family rather than the patient, may the therapist be relieved of an obligation to act on the information, no matter how credible, simply because it has not come directly from the "patient"? We do not believe so. When the communication of the serious threat of physical violence is received by the therapist from a member of the patient's immediate family and is shared for the purpose of facilitating and furthering the patient's treatment, the fact that the family member is not technically a "patient" is not crucial to the statute's purpose.

Our construction harmonizes the competing principles discussed above and is consistent with the interpretation placed on the psychotherapist-patient evidentiary privilege (Evid. Code, § 1010 et seq.). Because section 43.92 was prompted by *Tarasoff* and *Hedlund*, and because *Tarasoff* itself is rooted in the psychotherapist-patient privilege (see *Tarasoff, supra,* 17 Cal.3d 425, 441), the two statutory schemes should be accorded complementary interpretations, if at all possible.

■ A statement between a therapist and third persons may be a confidential patient communication, and hence privileged, if it assists the therapist in the diagnosis, treatment or cure of a patient's mental or emotional illness. (Evid. Code, § 1012.) Thus, a communication between a patient and his or her therapist's staff or professional associates is presumed to be privileged if the communication occurs in order to further the therapeutic relationship. (Evid. Code, §§ 917, subd. (a), 1014, subd (c).) Similarly, information is considered a "confidential communication between patient and psychotherapist," even if it is shared in the presence of third persons—such as participants in group or joint counseling, or marriage and family counseling—so long as the information is disclosed in confidence and in an effort to accomplish the purpose of the patient's therapy. (Evid. Code, § 1012.)

■ More to the point, a communication between a patient's family members and the patient's therapist, made in the course of or functionally related to the diagnosis and treatment of the patient, also is protected by the psychotherapist-patient privilege. (See Evid. Code, § 1014; *Grosslight v. Superior Court* (1977) 72 Cal.App.3d 502, 508 [140 Cal.Rptr. 278], fns. omitted [Holding that the "privilege established by [Evidence Code section 1014] includes all relevant communications to psychotherapists . . . by intimate family members of the patient"].) The reasons for according protection to the patient's treatment are clear. A mental illness or an emotional problem does not exist in a vacuum. In order to effectively treat a patient, a therapist must often explore the contextual aspects of a patient's mental illness or emotional problem associated with or impacted by his or her life history, current circumstances, and personal or familial relationships. Protecting these communications from disclosure, as if they are the patient's own, furthers the patient's therapy by giving the therapist a fuller understanding of the problem or illness for which his or her expertise is needed by encouraging the patient and his or her family members to fully disclose information they might otherwise be embarrassed or reluctant to reveal.

■ The Legislature has long recognized that information conveyed to a therapist by a patient's parent or other family member is relevant and sufficiently important to be considered and incorporated into developing the best treatment for a patient, and is worthy of protection from disclosure.

Despite its privileged nature, the Legislature also has recognized that the therapist's duty to protect that information must yield once the therapist comes to believe the information must be revealed to prevent danger to his or her patient or another. (Evid Code, § 1024.) We discern no principled reason why equally important information in the form of an actual threat that a parent shares with his or her son's therapist about the risk of grave bodily injury the patient poses to another also should not be considered a "patient communication" in determining whether the therapist's duty to warn is triggered under section 43.92.[10]

The point is illustrated by the facts of this case. On June 21, Goldstein spoke with Colello. Even though Colello admitted thinking about suicide, the therapist did no more than encourage him to consider checking into a hospital. Later that day, however, after speaking with Colello's father, who told him Colello was indeed suicidal and had threatened Ewing, Goldstein made arrangements to immediately admit Colello to a hospital psychiatric ward. If Colello's father's information was credible and important to Goldstein's determination that immediate hospitalization was necessary to prevent Colello's suicide, the information also could be germane to Goldstein's determination as to whether Colello posed a risk of serious physical harm to Williams's new boyfriend, so that Goldstein was required to warn the boyfriend and law enforcement agency.

The danger inherent in the trial court's literal reading of the statute is illustrated by the following hypothetical. Imagine that Colello's father called Goldstein on June 21 and told him that Colello said he intended to shoot Keith Ewing at 3:00 the following afternoon. Goldstein spoke with Colello himself, found Colello's father's representations credible even though the actual threat was not repeated, and convinced Colello to immediately check himself into a psychiatric hospital. Goldstein also spoke with the hospital's staff psychiatrist to stress the importance of keeping Colello for observation, but did not notify Ewing or a law enforcement agency of the danger. Colello then was discharged from the hospital on June 22 and killed Ewing, as planned. Under the trial court's reading of section 43.92, Goldstein had no duty to warn and was immune from liability, simply because the information which he found credible and on which he acted came from Colello's father, rather than from Colello himself. The statute cannot fairly be read to sanction such a result.

---

[10] We are not faced with and do not address the situation in which a third party who is not a member of the patient's immediate family, but who may be involved in his therapy in some manner (e.g., an intimate or close friend), conveys the information of the patient's potential dangerousness to the therapist.

By this decision, we do not conclude the information shared with Goldstein was necessarily sufficient to trigger his duty to warn. It is plausible, based on his years of treating Colello, his knowledge of his patient's mental illness, emotional problems and behavioral characteristics, and the information he learned from both Colello and Colello's father, that Goldstein believed Colello presented a danger to himself but had not made a serious threat of physical violence against Keith Ewing.[11] Our conclusion is limited. We hold that the trial court erroneously refused, as a matter of law, to consider the information a patient's family member shared with the therapist in determining the existence of a material factual dispute as to whether the patient had communicated to the therapist a serious threat of physical violence to another, simply because the information did not flow directly from the patient to the therapist.[12]

> b. *A therapist's duty to warn a victim arises if the information communicated to the therapist leads the therapist to believe his or her patient poses a serious risk of grave bodily injury to another.*

The Ewings also insist section 43.92 is fatally ambiguous because it is not clear whether the term "serious," as used in the phrase "serious threat of physical violence," refers solely to the patient's state of mind, or whether it must instead be read as a part of the phrase "serious threat," referring to the probability of harm or its magnitude. They also claim the statutory phrase "physical violence against" is unclear because it fails to specify whether a threat of physical injury to an actual person is required as opposed to an item of the target individual's property, or whether the therapist's duty to warn is triggered if a patient's expresses his intention to "gently slap or pinch a victim." These claims have no merit.

Divorced from reality and viewed in isolation, section 43.92's use of the phrase "serious threat of physical violence" might be read to refer to the credibility of the patient's stated intentions, the harm likely to be suffered irrespective of his or her intent, or the gravity of the threatened injury. However, in view of the policies that the statute seeks to balance, and the purpose for which it was enacted, the phrase cannot be viewed in the abstract and is not unclear. "[S]entences are not to be viewed in isolation but in light of the statutory scheme." (*Torres v. Automobile Club of So. California* (1997)

---

[11] The parties do not dispute that Ewing was a reasonably identifiable victim.

[12] Not every statement made by a family member falls under section 43.92. The statute applies only to threats. Thus, a statement of mere belief by the family member that the patient poses a danger, unaccompanied by a statement of a threat, would not by itself give rise to potential liability.

15 Cal.4th 771, 777 [63 Cal.Rptr.2d 859, 937 P.2d 290].) A statute must be read to effectuate its purpose, and a construction that is unreasonable is a sound basis for its rejection. (See *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1159 [278 Cal.Rptr. 614, 805 P.2d 873]. )

Section 43.92 was intended to eliminate immunity and to sanction an invasion into the psychotherapist-patient privilege only in the very narrow circumstance in which actual knowledge of potentially grave bodily injury is presented. With that purpose in mind, we are not able to seriously credit the Ewings' contention that a psychotherapist might be expected effectively to destroy his or her professional relationship with a patient and reveal sensitive, confidential information if he or she believes the patient is "jesting," intends only to damage someone's physical property, or plans to "gently slap or pinch a victim."

The intent of the statute is clear. A therapist has a duty to warn if, and only if, the threat which the therapist has learned—whether from the patient or a family member—actually leads him or her to believe the patient poses a risk of grave bodily injury to another person.[13] Regardless of the definition of "serious" applied to section 43.92, there can be no question that, as in this case, a threat to take another's life, if believed, is sufficient to trigger a therapist's duty to warn the intended victim and a law enforcement agency. Although every case must be decided on its own facts, we conclude a therapist's duty to breach a patient's confidence in favor of warning an intended victim could also arise if the therapist becomes aware the patient intends to commit an act or acts of grave bodily injury short of murder, but akin to "mayhem" or "serious bodily injury" as defined by statute. (See Pen. Code, §§ 203 ["Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem."], 243, subd. (f)(4) [" 'Serious bodily injury' means a serious impairment of physical condition, including, but not limited to, the following: loss of consciousness; concussion; bone fracture; protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement."].)

We reject the Ewings' invitation to "declare the provisions of Civil Code section 43.92 unconstitutionally vague and therefore void."

---

[13] As originally introduced, Assembly Bill No. 1133 referred to "actual" threats. That term was changed to "serious" after the Attorney General pointed out it might preclude liability if the patient made an entirely credible threat, but posed it in conditional terms (i.e., "I'm going to kill X if . . . ," or "I might kill X.") (See Senate Com. on Judiciary, Analysis of Assem. Bill No. 1133 (1985–1986 Reg. Sess.), p. 4, ¶ 3.)

2. *Communication to the therapist by a member of the patient's family of the patient's threat to kill or cause grave bodily injury to the victim raised a triable issue concerning the therapist's duty to warn.*

The Ewings contend summary judgment was unwarranted because material factual issues remain as to whether Goldstein believed Colello intended to kill or cause serious physical harm to their son Keith. We agree.

The information known to Goldstein before the murder was that, in June 2001, Colello was depressed over his breakup with Williams, and Goldstein believed he was "feeling obsessed about what [Williams] was doing with her boyfriend." Colello told Goldstein he knew Keith Ewing's name and the address where he lived. He admitted driving past Ewing's house and becoming scared "thinking that he might get out of control and ruin everything," by which Colello meant "his job and possibly a future with [Williams]." Colello admitted intercepting several telephone messages from Ewing, and wondered "how [Williams] could be in love with this guy." Goldstein specifically asked Colello if he planned to follow or stalk Ewing. Colello denied any such intention, and said "he just wanted to know where [Williams] was going." Colello told Goldstein he had "driven past this guy's home," but said he "wasn't going to do anything," and "just wanted to see this guy." By June 21, Colello admitted thinking about suicide, and Goldstein arranged for him to be seen at a hospital emergency room. On June 22, after Colello's father told him the hospital planned to discharge Colello, Goldstein contacted the treating physician, explained to him why Colello should remain hospitalized, and asked him to reevaluate Colello and keep him in the hospital through the weekend. We agree with the trial court that this information, considered alone, is insufficient to establish that Goldstein was aware that Colello intended to gravely injure Keith.

■ This information, however, cannot be viewed in isolation. The trial court also was required to consider the threat Colello shared with his father, which the father communicated to Goldstein. If a fact finder, viewing this evidence and Goldstein's conduct, believed Colello's father told the therapist about his son's stated intentions to do physical violence, it could conclude Goldstein had sufficient information to trigger his duty to warn. Because triable factual questions remain, Goldstein's motion for summary judgment should not have been granted.

## DISPOSITION

The judgment is reversed. Costs are awarded to the Ewings.

Cooper, P. J., and Rubin, J., concurred.

Respondent's petition for review by the Supreme Court was denied November 10, 2004. Baxter, J., and Brown, J., were of the opinion that the petition should be granted.