CAROL K. MUNSTERMANN, PERSONAL REPRESENTATIVE OF THE
ESTATE OF JODI SUE ROWE, DECEASED, APPELLEE, V. ALEGENT
HEALTH - IMMANUEL MEDICAL CENTER, A NOT-FOR-PROFIT
CORPORATION, AND HUDSON HSIEH, M.D., APPELLANTS.

716 N.W.2d 73

Filed June 23, 2006.    No. S-04-1312.

P. Shawn McCann, Joseph S. Daly, and Mary M. Schott, of Sodoro, Daly & Sodoro, P.C., for appellants.

William T. Ginsburg for appellee.

HENDRY, C.J., CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ., and HANNON, Judge, Retired.

GERRARD, J.

Marty Nuzum murdered his estranged girl friend, Jodi Sue Rowe, on February 12, 2002. The question presented in this appeal is whether Nuzum communicated a serious threat of physical violence against Rowe to the defendants, Nuzum's treating psychiatrist and health care facility, such that the defendants were under a duty to take reasonable precautions to prevent the murder. The jury in this case was unable to reach a verdict, and the district court declared a mistrial. The defendants appeal from the judgment of the district court denying their motion for judgment notwithstanding the verdict. We affirm the district court's denial of the defendants' motion for judgment notwithstanding the verdict, and remand the cause for a new trial.

## BACKGROUND

### PROCEDURAL HISTORY

This is an action for wrongful death brought by Carol K. Munstermann, personal representative of Rowe's estate, against Alegent Health – Immanuel Medical Center (Alegent) and Hudson Hsieh, M.D., Nuzum's treating psychiatrist at Alegent, for their alleged failure to protect or warn Rowe.

The matter went to trial, after which the defendants made a motion for directed verdict, arguing, inter alia, that there was insufficient evidence that Nuzum communicated a serious threat of physical violence against Rowe to the defendants to give rise to a duty to protect or warn Rowe. The motion was denied, and the matter was submitted to the jury, but the jury was unable to reach a verdict. A mistrial was declared, and the defendants moved for a judgment notwithstanding the verdict, which was denied. See Neb. Rev. Stat. § 25-1315.02 (Cum. Supp. 2004). This appeal followed. See Neb. Rev. Stat. § 25-1315.03 (Reissue 1995).

### TRIAL EVIDENCE

Nuzum was admitted to inpatient care at Alegent on February 4, 2002, when he checked himself in, suffering from depression and suicidal ideations. Nuzum was treated by Hsieh. Nuzum had been treated as an inpatient at Alegent in January 2002, following a suicide attempt. Nuzum had attempted suicide in 1990, 2000, and 2002.

When Nuzum was admitted in January 2002, he was not found to exhibit any homicidal tendencies. Nuzum was examined and observed for homicidal risk factors during his week as an inpatient, and none were found. When Nuzum checked himself back in on February 4, he again denied having homicidal ideations or assaultive behavior.

Nuzum was seen by Hsieh on February 5, 2002, with several medical students present, and one of those students, Rebecca Gurney (who is now a medical doctor), transcribed notes for Hsieh. Because those notes are central to the plaintiff's case, they are set forth below in their entirety.

2/5/02

M3 transcribing for Dr. Hsieh

Pt was last here ~ 1 mo ago. Pt was to follow up with therapist and take medications. Pt was working, did Ø see

therapist. Pt was taking meds. Pt is having problems with girlfriend - she doesn't understand depression. He has been calling into work, doesn't want to get out of bed.

Pt has had suicidal thoughts. He wants to sleep all time, stop thinking.

Thought he would come here before he hurt himself.

Pt was thinking of hurting girlfriend also since she is hurting him. Girlfriend doesn't want to talk about his depression. She won't participate here.

Pt is on Remeron (15 mg) now. Makes him sleep.

Pt doesn't trust himself.

Increase Remeron dose.

[Signed] R. Gurney [M3]

Nuzum was discharged from Alegent on February 7, 2002. His discharge summary indicated that he had recovered from this instance of severe depression and that his suicidal ideations had subsided. Nuzum had been consistently assessed during his stay for homicidal risk factors, and none were present. Nuzum was prescribed medications, instructed on how to follow up with individual psychotherapy, and encouraged to attend community support.

On February 12, 2002, Nuzum murdered Rowe after she came to his apartment to retrieve a set of car keys. Neither Hsieh nor any employee of Alegent acted to warn Rowe or law enforcement that Nuzum might be dangerous.

The primary issue at trial was how to interpret the indication in Gurney's February 5, 2002, notes that Nuzum "was thinking of hurting girlfriend also since she is hurting him." Gurney testified that she never thought that Nuzum was a threat to Rowe. Gurney said that Nuzum had been consistently worried about losing Rowe, because he thought Rowe would leave him because of his depression. Gurney testified that after Nuzum said he was thinking of hurting Rowe, the medical students and Hsieh went into more detail with Nuzum to find out what he meant by the remark. Gurney recalled that Nuzum was asked

> why he would want to do that; what he meant by it, and [Nuzum] kind of said that he was saddened and frustrated that his girlfriend was not more supportive of him while he was depressed. Kind of wanted him to snap out of it, just

be happy, and that really made him feel bad. And because of that, [Nuzum] wanted her to feel the same pain that he was feeling.

Gurney said that when she wrote that Nuzum was thinking of hurting Rowe, it indicated "an emotional hurt." Gurney later explained that her notes were only intended to transcribe "kind of the general gist of the whole thing," not "specifically writing out every little thing that they said." .

Hsieh similarly testified that Gurney's February 5, 2002, notes were not a verbatim account of what happened, but were an accurate transcription. Hsieh explained that Nuzum's statement that he was "thinking of hurting girlfriend" was actually in response to direct questioning from Hsieh.

[W]e also talk about — well, now, would it hurt when you injure yourself, and we talk about that he has overdosed on the antifreeze two years before, a month ago. Why would you do that? That was my question. And what were you thinking about when you were injecting the — ingesting the antifreeze? And that's when he said I was thinking about hurting her because she hurt me so much.

Hsieh further explained that this was a common question asked of a suicidal patient—what the patient was thinking when making a suicide attempt. According to Hsieh, Nuzum said that Rowe had hurt him, "[s]o when he took an overdose, it's a way to say — see what you are doing to me? You're hurting me." Hsieh explained that when Nuzum said Rowe was hurting him, Nuzum meant that she had hurt him in an emotional way,

[a]nd so this is how [Nuzum] presented to let her know and get back at her by his taking an overdose. And we did also talk about it on different occasions. And not why would anybody go that far to do it, and his response was it worked. Every time he attempted suicide, she came back to him.

Hsieh agreed that Nuzum was emotionally hurt and that Nuzum thought by attempting suicide, he would hurt Rowe too.

Hsieh agreed with Gurney's explanation of what was meant by her February 5, 2002, notes. Although the word "emotional" did not appear in the notes, Hsieh testified he did not believe it was necessary at the time, "[b]ecause [of] the way the conversation flew, and basically [it was] very, very clear that that's what he

meant. That's what he meant emotionally. He wanted to get back at her."

However, the plaintiff's expert witness, Charles Wadle, M.D., testified that in his opinion, Nuzum's suicidal ideations had become more lethal and his hospitalizations had gotten closer together, and this reflected a deterioration in Nuzum's condition. Wadle stated that prior to the February 5, 2002, notes, Nuzum had always talked about hurting himself, which he characterized in the context of suicidal behavior, or self-harm. Wadle testified with reference to the February 5 notes that "here [Nuzum's] referencing hurting the girlfriend, which could very likely indicate harming her physically." Wadle conceded, however, that the records contained no other reference to hurting Rowe, or anyone other than Nuzum.

Wadle found no reference in the medical record to Nuzum's attempting to emotionally hurt his girl friend, stating that the notes were "[t]otally void of any documentation of a subsequent conversation to define hurt." Wadle opined that if such a conversation had occurred, it should have been included in the medical records. When asked on cross-examination if Gurney and Hsieh were credible in their testimony regarding the February 5, 2002, notes, Wadle stated that

> [t]heir recollection of such as they have indicated in the deposition is an index of suspicion when they believe it was necessary to go back and qualify the meaning of hurting in an individual who has always used [the] word to imply physical. They went back, asked him, did not document, despite three opportunities, maybe even four, in this medical record. And months to years later, they recall having done that. I don't know if they lied. I don't know if they were just flagrantly aloof when they did this record, but it's not documented in real time for anybody to know what transpired.

Wadle also testified that had the defendants followed what Wadle thought to be the relevant standard of care, a "support system" would have been in place for Nuzum following his discharge and Alegent personnel would have checked with Nuzum to make sure he followed the conditions under which he was discharged. Wadle also testified that the defendants had a "duty to warn" and opined over objection that had Rowe "been forewarned of a threat

to her by . . . Nuzum, she would have had an opportunity to avoid contact with him and may have lived."

In contrast, the defendants' expert witness, Eli Chesen, M.D., testified that in the context of the rest of the notes, and all of Nuzum's treatments, the February 5, 2002, notes

> can only be interpreted that [Nuzum] was wanting to hurt her emotionally, as he had done in a repetitive pattern in previous years. And this is a man who was quite versed and quite skilled in using emotional blackmail making other people feel guilty for the way he felt. And I think this progress note, in the context of all the medical records, and all of the information I have been able to review, would indicate that he's talking about hurting her emotionally, just as she has emotionally hurt him, in his interpretation anyway.

Chesen testified that this pattern of emotional blackmail was described "pretty clearly" in Nuzum's previous hospitalizations. Chesen opined that the defendants had met the standard of care in treating Nuzum.

## ASSIGNMENTS OF ERROR

The defendants assign, consolidated and restated, that the district court erred (1) in failing to grant the defendants' motions for directed verdict and judgment notwithstanding the verdict, on the basis of insufficient evidence of duty; (2) in instructing the jury that the action was a medical malpractice action, and on the standard of care for a medical malpractice action; and (3) in failing to grant the defendants' motions for directed verdict and judgment notwithstanding the verdict, on the basis of insufficient evidence of causation.

## STANDARD OF REVIEW

On a motion for judgment notwithstanding the verdict, the moving party is deemed to have admitted as true all the relevant evidence admitted which is favorable to the party against whom the motion is directed, and, further, the party against whom the motion is directed is entitled to the benefit of all proper inferences deducible from the relevant evidence. *LeRette v. American Med. Security*, 270 Neb. 545, 705 N.W.2d 41 (2005). To sustain a motion for judgment notwithstanding the verdict, the court

resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion. *Id.*

## ANALYSIS

### Legal Background

The threshold inquiry in this appeal is whether the defendants owed the plaintiff a legal duty. See *Popple v. Rose*, 254 Neb. 1, 573 N.W.2d 765 (1998). This is our first opportunity to address the issues most closely associated with the California Supreme Court's decision in *Tarasoff v. Regents of University of California*, 17 Cal. 3d 425, 551 P.2d 334, 131 Cal. Rptr. 14 (1976) (*Tarasoff*). In *Tarasoff*, the plaintiffs alleged that the defendant therapist had a duty to warn their daughter of the danger posed to her by one of the therapist's patients. The court recognized the general rule that a person owes no duty to control the acts of another. But the court adopted Restatement (Second) of Torts § 315 at 122 (1965), which provides:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
>
> (b) a special relation exists between the actor and the other which gives to the other a right to protection.

Applying this exception, the *Tarasoff* court held that the relationship between the patient and her therapist was sufficient to support the imposition of an affirmative duty on the defendant for the benefit of third persons. The *Tarasoff* court further held that a therapist's duty to act arises when the therapist determines, or pursuant to the standards of the profession should determine, that the patient presents a serious danger of violence to another.

The vast majority of courts that have considered this issue have accepted the *Tarasoff* analysis. See *Bradley v. Ray*, 904 S.W.2d 302 (Mo. App. 1995) (collecting cases). In *Lipari v. Sears, Roebuck & Co.*, 497 F. Supp. 185 (D. Neb. 1980), the U.S. District Court for the District of Nebraska correctly predicted that this court would adopt § 315. See, *Bartunek v. State*, 266

Neb. 454, 666 N.W.2d 435 (2003); *Hamilton v. City of Omaha*, 243 Neb. 253, 498 N.W.2d 555 (1993); *Popple v. Rose, supra*. See, also, *Foley v. Bishop Clarkson Memorial Hospital*, 185 Neb. 89, 173 N.W.2d 881 (1970) (hospital must guard against patient's mental condition discoverable by exercise of reasonable care). Based on that determination, the U.S. District Court concluded that this court would adopt the *Tarasoff* holding as well. *Lipari v. Sears, Roebuck & Co., supra*.

In the wake of *Tarasoff*, however, the California Legislature restricted the scope of *Tarasoff* liability. See Cal. Civ. Code § 43.92 (West Cum. Supp. 2006). Under § 43.92(a), a duty to warn of and protect from a patient's threatened violent behavior arises only "where the patient has communicated to the psychotherapist a serious threat of physical violence against a reasonably identifiable victim or victims." Several states have enacted similar statutes based upon California's example, including Nebraska. See *Bradley v. Ray, supra* (collecting statutes).

### NEBRASKA STATUTES

Neb. Rev. Stat. § 71-1,336 (Reissue 2003) provides, in relevant part:

> (1) There shall be no monetary liability on the part of, and no cause of action shall arise against, any person who is licensed or certified [as a mental health practitioner] for failing to warn of and protect from a patient's threatened violent behavior or failing to predict and warn of and protect from a patient's violent behavior except when the patient has communicated to the mental health practitioner a serious threat of physical violence against himself, herself, or a reasonably identifiable victim or victims.

> (2) The duty to warn of or to take reasonable precautions to provide protection from violent behavior shall arise only under the limited circumstances specified in subsection (1) of this section. The duty shall be discharged by the mental health practitioner if reasonable efforts are made to communicate the threat to the victim or victims and to a law enforcement agency.

The parties to this appeal tried this case, and filed their appellate briefs, on the assumption that § 71-1,336 was controlling.

That assumption, however, was misplaced. As will be explained in more detail below, the defendant in this case, Hsieh, is a psychiatrist—a physician, licensed pursuant to Neb. Rev. Stat. §§ 71-1,102 to 71-1,107.14 (Reissue 1996 & Cum. Supp. 2000). The Nebraska statutes specify the scope of *Tarasoff* liability for psychologists and "mental health practitioners," but do not provide corresponding statutory language for psychiatrists.

Section 71-1,336 applies, quite specifically, to persons "licensed or certified pursuant to sections 71-1,295 to 71-1,338." Those sections of the Uniform Licensing Law apply to "mental health practitioners," which are described as including "social workers, master social workers, professional counselors, and marriage and family therapists." Neb. Rev. Stat. § 71-1,295 (Reissue 2003). Mental health practice means the provision of treatment, assessment, psychotherapy, counseling, or equivalent activities to individuals, couples, families, or groups for behavioral, cognitive, social, mental, or emotional disorders, including interpersonal or personal situations. Neb. Rev. Stat. § 71-1,307 (Reissue 2003). However,

> [m]ental health practice *shall not include* the practice of psychology or medicine, prescribing drugs or electroconvulsive therapy, treating physical disease, injury, or deformity, diagnosing major mental illness or disorder except in consultation with a qualified physician or a psychologist licensed to engage in the practice of psychology as provided in section 71-1,206.14 . . . .

(Emphasis supplied.) § 71-1,307. In fact, mental health practitioners are prohibited from representing themselves as physicians or psychologists and from representing their services as medical or psychological in nature. Neb. Rev. Stat. § 71-1,308 (Reissue 2003).

It is important to note the difference between psychologists and psychiatrists. Psychology is the science dealing with mental processes, both normal and abnormal, and their effects upon behavior. Taber's Cyclopedic Medical Dictionary 1591 (18th ed. 1997). Psychiatry, on the other hand, is the branch of medicine that deals with the diagnosis, treatment, and prevention of mental illness. *Id.* at 1590. In other words, psychiatrists are medical doctors who specialize in mental illness, while psychologists

belong to a separate discipline devoted to understanding the human mind and, in clinical psychology, concerned with diagnosing and treating mental disorders. See *id.* at 1591.

Psychologists are licensed pursuant to Neb. Rev. Stat. §§ 71-1,206.01 to 71-1,206.35 (Reissue 1996 & Cum. Supp. 2000).

> Practice of psychology shall mean the observation, description, evaluation, interpretation, or modification of human behavior by the application of psychological principles, methods, or procedures for the purpose of preventing or eliminating symptomatic, maladaptive, or undesired behavior and of enhancing interpersonal relationships, work and life adjustment, personal effectiveness, behavioral health, and mental health. The practice of psychology shall include, but not be limited to, psychological testing and the evaluation or assessment of personal characteristics . . . counseling, psychoanalysis, psychotherapy, hypnosis, biofeedback, and behavior analysis and therapy; diagnosis and treatment of mental and emotional disorders, alcoholism and substance abuse, disorders of habit or conduct, and the psychological aspects of physical illness, accident, injury, or disability; psychoeducational evaluation, therapy, remediation, and consultation . . . .

§ 71-1,206.08. Section 71-1,206.30 provides in part:

> (1) No monetary liability and no cause of action shall arise against any psychologist for failing to warn of and protect from a client's or patient's threatened violent behavior or failing to predict and warn of and protect from a client's or patient's violent behavior except when the client or patient has communicated to the psychologist a serious threat of physical violence against a reasonably identifiable victim or victims.
>
> (2) The duty to warn of or to take reasonable precautions to provide protection from violent behavior shall arise only under the limited circumstances specified in subsection (1) of this section. The duty shall be discharged by the psychologist if reasonable efforts are made to communicate the threat to the victim or victims and to a law enforcement agency.

In contrast to psychologists and other mental health professionals, psychiatrists, as medical doctors, are licensed pursuant to §§ 71-1,102 to 71-1,107.14. Those sections contain no equivalent to §§ 71-1,206.30 or 71-1,336. In short, the duty of psychologists and other mental health professionals to warn and protect third persons is controlled by statute, but a psychiatrist's duty is not addressed by statute, and is still controlled by common law.

After the present appeal was submitted to this court, based upon our consideration of the statutory scheme, we directed the parties to file supplemental briefs addressing whether Hsieh's duty, in his treatment of Nuzum, was controlled by statute. Based upon the reasoning we have set forth above, the parties agree that neither § 71-1,336, nor any other statute, addresses Hsieh's duty in his treatment of Nuzum. The defendants now assert that in the absence of a specifically applicable statute, they owed no duty at all to warn and protect Rowe. The plaintiff insists that in the absence of a statute, the case should have been tried as an ordinary medical malpractice action. We do not accept either of these contentions.

## DUTY ANALYSIS

The threshold inquiry in any negligence action, including those involving a duty to warn and protect, is whether the defendant owed the plaintiff a duty. *Popple v. Rose*, 254 Neb. 1, 573 N.W.2d 765 (1998). A duty is defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another. *Id.* Whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation. *Fuhrman v. State*, 265 Neb. 176, 655 N.W.2d 866 (2003); *Sharkey v. Board of Regents*, 260 Neb. 166, 615 N.W.2d 889 (2000). When making that determination a court considers (1) the magnitude of the risk, (2) the relationship of the parties, (3) the nature of the attendant risk, (4) the opportunity and ability to exercise care, (5) the foreseeability of the harm, and (6) the policy interest in the proposed solution. See *id.*

In this case, we are also mindful of the fact that the determination of a legal duty is fundamentally based in public policy considerations, see *Popple v. Rose, supra*, and it is generally the

function of the Legislature to declare what is the law and public policy of this state, see *State v. Gales*, 269 Neb. 443, 694 N.W.2d 124 (2005), *cert. denied* 546 U.S. 947, 126 S. Ct. 449, 163 L. Ed. 2d 341. See, also, *In re Claims Against Atlanta Elev., Inc.*, 268 Neb. 598, 685 N.W.2d 477 (2004). Although §§ 71-1,206.30(1) and 71-1,336 "may not be literally applicable, [they are] clearly indicative of legislatively approved public policy." See *Parson v. Chizek*, 201 Neb. 754, 758, 272 N.W.2d 48, 51 (1978). See, also, *Ob-Gyn v. Blue Cross*, 219 Neb. 199, 361 N.W.2d 550 (1985).

■ Given our prior endorsement of Restatement (Second) of Torts § 315 (1965), and the clearly articulated public policy expressed in §§ 71-1,206.30(1) and 71-1,336, we conclude that in some circumstances, a special relation may exist between a psychiatrist and patient which imposes a duty upon the psychiatrist to warn or protect a reasonably identifiable victim when a patient has communicated a serious threat of physical violence against that potential victim. However, given the Legislature's decision to limit *Tarasoff* by enacting §§ 71-1,206.30(1) and 71-1,336, we find that the limitations set forth in those sections should also be applied to psychiatrists. The Legislature has made a public policy determination with respect to the *Tarasoff* duty that this court is bound to respect. We see no rational basis for distinguishing the *Tarasoff* duty of psychiatrists from that of psychologists or other mental health practitioners.

Moreover, the analysis of California's identical statutory language, from which the Nebraska statutes were derived, has revealed that the statute is based upon public policy concerns to which our familiar risk-utility test is applicable. See, *Fuhrman v. State, supra*; *Sharkey v. Board of Regents, supra*. The intent of limiting a *Tarasoff* duty to situations in which the patient communicates a serious threat of physical violence was not to overrule *Tarasoff*, but, rather, to preempt an expansive ruling that a therapist can be held liable for the mere failure to predict potential violence by his or her patient. *Ewing v. Goldstein*, 120 Cal. App. 4th 807, 15 Cal. Rptr. 3d 864 (2004). The statutory language represents an effort to strike an appropriate balance between conflicting policy interests. *Id.*

On the one hand, the need to preserve a patient confidence recognizes that effective diagnosis and treatment of a mental illness

or an emotional problem is severely undermined when a patient cannot be assured that a statement made in the privacy of his or her therapist's office will not be revealed. *Id.* On the other hand is the recognition that under limited circumstances, preserving a confidence is less important than protecting the safety of someone the patient intends to harm. *Id.* In other words, the statutory language is the result of balancing risk and utility, considering the magnitude of the risk, relationship of the parties, nature of the risk, opportunity and ability to exercise care, foreseeability of the harm, and public policy interest in the proposed solution. See, *Fuhrman v. State*, 265 Neb. 176, 655 N.W.2d 866 (2003); *Sharkey v. Board of Regents*, 260 Neb. 166, 615 N.W.2d 889 (2000).

■ Considering our risk-utility test, and the relevant public policy determinations made by the Legislature, we conclude the same duty should be required of psychiatrists as is required of psychologists and other mental health practitioners. We hold, in accord with §§ 71-1,206.30(1) and 71-1,336, that a psychiatrist is liable for failing to warn of and protect from a patient's threatened violent behavior, or failing to predict and warn of and protect from a patient's violent behavior, when the patient has communicated to the psychiatrist a serious threat of physical violence against himself, herself, or a reasonably identifiable victim or victims. The duty to warn of or to take reasonable precautions to provide protection from violent behavior shall arise only under those limited circumstances, and shall be discharged by the psychiatrist if reasonable efforts are made to communicate the threat to the victim or victims and to a law enforcement agency.

## DEFENDANTS' LIABILITY

With that established, the issue to be confronted in this case is whether Nuzum actually communicated a serious threat of physical violence to the defendants. In that regard, it is important to note that in striking a balance between the protection of third parties and the preservation of medical confidentiality, the statutory language from which our holding is derived is intended to eliminate a therapist's immunity and sanction an invasion into the therapist-patient privilege only in the narrow circumstance in which actual knowledge of potentially grave bodily injury is presented. *Ewing v. Goldstein, supra.*

The phrase " 'serious threat of physical violence' " does not refer to the credibility of a patient's stated intentions, the harm likely to be suffered irrespective of his or her intent, or the gravity of the threatened injury. *Id.* at 820, 15 Cal. Rptr. at 874. The psychiatrist's duty to third parties is not premised on a professional standard of care. See *Ewing v. Northridge Hosp. Medical Center*, 120 Cal. App. 4th 1289, 16 Cal. Rptr. 3d 591 (2004). Rather, it rests entirely on the fact finder's determination that each factual predicate of the cause of action is satisfied: the existence of a professional relationship, the psychiatrist's actual belief or prediction that the patient poses a serious risk of inflicting grave bodily injury, a reasonably identifiable victim, and the failure to undertake reasonable efforts to warn the victim and a law enforcement agency. *Id.* The question is whether a serious threat of physical violence was actually "communicated" to the psychiatrist. Thus, a duty to warn and protect arises only if the information communicated to the psychiatrist leads the psychiatrist to believe that his or her patient poses a serious risk of grave bodily injury to another. See *Calderon v. Glick*, 131 Cal. App. 4th 224, 31 Cal. Rptr. 3d 707 (2005).

This does not mean that in an appropriate case, a finder of fact could not conclude that a particular threat of violence was so serious that a defendant could not have believed it to be anything other than credible. See, e.g., *Ewing v. Northridge Hosp. Medical Center, supra.* Nor does it mean that in some instances, expert testimony might not be helpful to the trier of fact in evaluating a defendant's testimony about whether he or she believed a particular threat of violence to be sincere. It simply means that in determining whether a duty to warn and protect is alleged to have arisen under the holding of this case, the focus should be on whether the patient actually communicated a serious threat of physical violence to his or her psychiatrist.

Given that understanding, the evidence in this case is less than clear as to whether Nuzum effectively communicated a serious threat of physical violence. There is little to dispute Hsieh and Gurney's testimony that each understood Nuzum's statements to indicate that he had, when attempting suicide, been attempting to emotionally hurt Rowe. Wadle testified that in his opinion, Nuzum was "most likely" referring to physical violence when he

made the statement at issue, but Wadle conceded that he had no basis to conclude that the defendants believed Nuzum was making such a threat.

However, the jury instructions given in this case illustrate that the parties and the trial court were working with differing, and mistaken, understandings of what the plaintiff was required to prove. The jury was instructed, without objection, of the exact language of § 71-1,336. But the jury was also instructed, again without objection, that this was "an action based upon a claim of malpractice, sometimes called professional negligence" and that under Nebraska law, the question was whether the defendants had used reasonable care, skill, and knowledge possessed and used under like circumstances by members of the profession engaged in a similar practice in the locality or similar localities. Those instructions were inconsistent with both one another and the duty to warn or protect principles set forth above. Given these instructions, and the evidence supporting liability under one instruction but not the other, it is not surprising that the jury was unable to reach a verdict.

We conclude, given the unsettled state of Nebraska law prior to this opinion, and the uncertainty evident at trial about what standards controlled liability in this case, that it would be inequitable to find that the plaintiff failed, as a matter of law, to meet the burden of proof on liability when the record before us was created without a clear understanding of what, precisely, the plaintiff was required to prove. "There was considerable uncertainty not only as to the existence of a legal duty but also as to the scope of any such duty and the appropriate method of discharging that duty." See *Perreira v. State*, 768 P.2d 1198, 1220 (Colo. 1989). Thus, the parties were at a considerable disadvantage in marshalling evidence in support of and in defense of the duty to warn or protect claim in the initial trial.

It would be unfair for this court to answer questions of first impression, then retroactively apply those answers without offering the plaintiff an opportunity to meet the bar that has been set. For this reason, we find no merit to the defendants' first assignment of error, arguing that they were entitled to a judgment as a matter of law based upon the lack of a legal duty to warn and protect. For the same reason, however, we conclude that there is

merit to the defendants' second assignment of error with respect to the jury instructions. Obviously, on retrial, the jury instructions should reflect the principles of duty explained above.

## PROXIMATE CAUSE

The defendants also argue that they were entitled to a directed verdict on the issue of causation, contending the evidence was insufficient to support a conclusion that any act or omission of the defendants proximately caused Rowe's murder. The defendants argue Wadle's testimony that the defendants' postdischarge provisions for Nuzum were below the standard of care and his opinion that had Rowe "been forewarned of a threat to her by . . . Nuzum, she would have had an opportunity to avoid contact with him and may have lived" are insufficient proof that had the defendants acted to protect or warn Rowe, those efforts would probably have been successful. As a result, the defendants argue that any breach of duty on their part was not the proximate cause of Rowe's death.

However, the same difficulties that make it impossible, on this record, to decide the issue of liability as a matter of law also preclude a finding as a matter of law with respect to proximate cause. An action predicated on a duty to warn and protect is essentially a negligence action. See *Popple v. Rose*, 254 Neb. 1, 573 N.W.2d 765 (1998). In order to prevail in such an action, a plaintiff must establish the defendant's duty to protect the plaintiff from injury, a failure to discharge that duty, and damages proximately caused by the failure to discharge that duty. See, *Washington v. Qwest Communications Corp.*, 270 Neb. 520, 704 N.W.2d 542 (2005); *Popple v. Rose, supra.* In order to prove proximate cause, it is necessary to understand both a defendant's duty, and what the defendant was required to do to discharge that duty—the question is whether the specific act or omission of the defendant was such that the ultimate injury to the plaintiff reasonably flowed from the defendant's alleged breach of duty. See *Fuhrman v. State*, 265 Neb. 176, 655 N.W.2d 866 (2003). The confusion at trial about the defendants' duty, and how that duty was to be discharged, necessarily affected the parties' ability to adduce evidence relevant to proximate cause.

Furthermore, the evidence reflects that Rowe was murdered at Nuzum's apartment, where she went to retrieve a set of car keys.

When all reasonable inferences are given to the plaintiff, see *LeRette v. American Med. Security*, 270 Neb. 545, 705 N.W.2d 41 (2005), we cannot say, as a matter of law, that reasonable jurors could not conclude that had Rowe been told Nuzum had threatened her, she might not have been in a position where she could be killed. See, e.g., *Estate of Long v. Broadlawns Med. Center*, 656 N.W.2d 71 (Iowa 2002); *Division of Corrections v. Neakok*, 721 P.2d 1121 (Alaska 1986). Cf. *Brandon v. County of Richardson*, 261 Neb. 636, 624 N.W.2d 604 (2001). Thus, we find no merit to the defendants' third and final assignment of error.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court overruling the defendants' motions for directed verdict and judgment notwithstanding the verdict, and remand the cause for a new trial consistent with this opinion.

AFFIRMED AND REMANDED FOR A NEW TRIAL.

WRIGHT, J., not participating.