Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/28/2021 08:10 AM CDT

Angela Rodriguez and Adan Rodriguez, Special
Administrators of the Estate of Melissa Rodriguez,
appellants, v. Lasting Hope Recovery Center
of Catholic Health Initiatives, formerly
known as Lasting Hope Recovery
Center of Alegent Creighton
Health, et al., appellees.

___ N.W.2d ___

Filed March 5, 2021.    No. S-19-1116.

1. **Employer and Employee: Negligence: Liability.** Under the doctrine of respondeat superior, an employer may be held vicariously liable for the negligence of an employee while acting within the scope of employment.
2. **Summary Judgment: Appeal and Error.** An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.
3. ____: ____. An appellate court reviews the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.
4. **Negligence.** The question whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation.
5. **Judgments: Appeal and Error.** In reviewing questions of law, an appellate court has an obligation to reach conclusions independently of those reached by the trial court.
6. **Trial: Evidence: Appeal and Error.** An appellate court reviews the factual findings underpinning a trial court's evidentiary rulings for clear error and reviews de novo the court's ultimate determination to admit evidence over an objection.

7. **Negligence: Damages: Proof.** To recover in a negligence action, a plaintiff must show that the defendant owed a duty toward the plaintiff, breached that duty, and caused damages.

8. **Negligence.** The threshold issue in any negligence action is whether the defendant owed a duty to the plaintiff.

9. ____. An actor whose conduct has not created a risk of physical harm to another has no duty of care to the other unless an affirmative duty created by another circumstance is applicable or a special relation exists between the actor and the third person, which imposes a duty upon the actor to control the third person's conduct.

10. ____. The special relationship between a custodian and persons in its custody gives rise to an affirmative duty of care by the custodian to third persons.

11. ____. A custodial relationship need not be full-time physical custody giving the custodian complete control over the other person. But to the extent that there is some custody and control of a person posing dangers to others, the custodian has an affirmative duty to exercise reasonable care, consistent with the extent of custody and control.

12. **Negligence: Physician and Patient: Mental Health: Liability.** A psychiatrist is liable for failing to warn of and protect from a patient's threatened violent behavior, or failing to predict and warn of and protect from a patient's violent behavior, when the patient has communicated to the psychiatrist a serious threat of physical violence against himself, herself, or a reasonably identifiable victim or victims. The duty to warn of or to take reasonable precautions to provide protection from violent behavior shall arise only under those limited circumstances and shall be discharged by the psychiatrist if reasonable efforts are made to communicate the threat to the victim or victims and to a law enforcement agency.

13. **Statutes: Judicial Construction: Legislature: Intent: Presumptions.** Where a statute has been judicially construed and that construction has not evoked an amendment, it will be presumed that the Legislature has acquiesced in the court's determination of the Legislature's intent.

14. **Negligence: Mental Health.** A duty to warn and protect arises only if the information communicated to the psychiatrist leads the psychiatrist to believe that his or her patient poses a serious risk of grave bodily injury to another.

15. ____: ____. A duty to warn and protect arises only if a serious threat of physical harm was actually communicated to the psychiatrist.

16. **Courts: Legislature.** A court should proceed cautiously when its decision would undermine a policy judgment of the Legislature.

17. **Negligence: Mental Health.** For a duty to warn or protect to arise, the requirement of actual communication means that the patient must

verbally express or convey to the psychiatrist his or her prediction to commit physical violence against himself, herself, or a reasonably identifiable victim or victims.

18. **Summary Judgment.** In the summary judgment context, a fact is material only if it would affect the outcome of the case.

19. **Negligence.** The common law's ordinary duty of care requires actors to exercise reasonable care.

20. ____. Whether an actor exercised reasonable care depends on whether a reasonable person of ordinary prudence would have done more in the same or similar circumstances.

21. **Negligence: Juries.** Where reasonable minds can disagree about whether reasonable care was followed, the question is generally left to the jury.

22. **Negligence: Liability: Public Policy.** When an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases, a court may decide that, as a matter of law, the defendant has no duty or that the ordinary duty of reasonable care requires modification.

23. **Judgments: Negligence: Public Policy.** A determination of no duty as a matter of law should be grounded in public policy and based upon legislative facts, not adjudicative facts arising out of the particular circumstances of the case.

24. **Judgments: Negligence: Liability: Public Policy.** A determination of no duty as a matter of law should be explained and justified based on articulated policies or principles that justify exempting the actor from liability or modifying the ordinary duty of reasonable care.

25. **Negligence: Physician and Patient: Mental Health.** Psychiatrists owe no duty as a matter of law to third parties for physical injuries caused by a patient who has not actually communicated a threat of physical violence. And once such an actual communication has taken place, any duty to warn or protect on the part of the psychiatrist can be discharged by reasonable efforts to communicate the threat to the victim and a law enforcement agency.

26. **Trial: Evidence: Appeal and Error.** The admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party.

27. ____: ____: ____. Erroneous exclusion of evidence does not require reversal if the evidence would have been cumulative and other relevant evidence, properly admitted, supports the trial court's finding.

Appeal from the District Court for Douglas County: James T. Gleason, Judge. Affirmed.

Brian E. Jorde, of Domina Law Group, P.C., L.L.O., for appellants.

Cathy S. Trent-Vilim, Denise M. Destache, and Patrick G. Vipond, of Lamson, Dugan & Murray, L.L.P., for appellee Lasting Hope Recovery Center of Catholic Health Initiatives.

Mary M. Schott and Joseph S. Daly, of Evans & Dixon, L.L.C., for appellee UNMC Physicians.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Papik, and Freudenberg, JJ.

Heavican, C.J.

## I. INTRODUCTION

This is a tort action brought to recover damages for the wrongful death of Melissa Rodriguez, who was killed by her ex-boyfriend, Mikael Loyd. Loyd was a patient for 6 days at Lasting Hope Recovery Center (Lasting Hope), a mental health care facility in Omaha, Nebraska, where he was treated by Dr. Jeana Benton, a psychiatrist employed by the University of Nebraska Medical Center Physicians (UNMC Physicians). Hours after Lasting Hope had discharged Loyd pursuant to Benton's order, Loyd strangled Melissa to death.

As special administrators for Melissa's estate, her parents, Angela Rodriguez and Adan Rodriguez (Special Administrators), brought a wrongful death action against Lasting Hope and UNMC Physicians for failing to warn and protect Melissa from Loyd. The district court granted summary judgment to Lasting Hope and UNMC Physicians on the basis that they owed no legal duty to Melissa. We affirm.

## II. FACTUAL BACKGROUND

On August 8, 2013, Loyd visited the Omaha Police Department (OPD) headquarters, stating that he wished to share information about his father's 1995 murder. He told OPD officers that he blamed his mother for the murder and that he sought OPD's help to have her killed in retaliation.

The OPD officers called Loyd's grandmother, who explained that Loyd was mentally ill and "not on his medications." Loyd's grandmother confirmed that in the past, she had also heard Loyd threaten to kill his mother. The OPD officers next called Loyd's mother, who lived in North Carolina, to warn her of Loyd's threats.

After a brief investigation, the OPD officers discovered an outstanding arrest warrant for Loyd, attributable to an alleged June 11, 2013, misdemeanor assault and battery of his girlfriend, Melissa. The OPD officers acknowledged that they could arrest Loyd pursuant to the warrant, but they expressed concern that if Loyd then made bond before he could obtain mental health treatment, he would again present a serious danger to the public. The OPD officers instead placed Loyd under emergency protective custody and transported him to Lasting Hope.[1]

At Lasting Hope, Benton was assigned as Loyd's treating psychiatrist. During an initial evaluation on August 9, 2013, Benton noted that Loyd "denies symptoms consistent with bipolar disorder . . . but appears extremely paranoid, distractible and at times appears to be responding to internal stimuli." She determined that Loyd was "very paranoid, homicidal and delusional and [a] risk for harm to others were he to be outside the hospital environment at this time." Benton recommended 5 to 7 days' "hospitalization for stabilization and safety."

Loyd remained at Lasting Hope from August 8 to 14, 2013. During this time, he called his mother and Melissa using Lasting Hope's landline telephone. Melissa twice visited Loyd at Lasting Hope. During her second visit, Melissa told Loyd that she no longer wished to be his girlfriend.

Based on statements that Benton had heard in which Loyd had specifically expressed a desire to kill his mother, Lasting Hope staff called Loyd's mother and warned her of his threats. But because Loyd had never expressed a similar threat against Melissa, she was not warned.

---

[1] See Neb. Rev. Stat. § 71-919 (Reissue 2018).

On August 12, 2013, Loyd dialed the 911 emergency dispatch service to turn himself in to police on his outstanding arrest warrant. OPD officers arrived at Lasting Hope that afternoon. Lasting Hope staff informed the OPD officers that Benton wished to continue to hold Loyd for further mental health evaluation. Apparently accepting Benton's determination that Loyd still needed mental health treatment at Lasting Hope, the OPD officers did not arrest Loyd at that time.

On August 14, 2013, Benton evaluated Loyd and determined that he was ready to be discharged. According to Benton, Loyd had been compliant with his medication for 6 days. Although still delusional about his father's murder, Loyd no longer expressed an intent to harm his mother. He reported to Benton that he "had a good conversation" with his mother over the telephone, and he committed to "not act to harm anyone." Benton concluded that Loyd was no longer a risk to himself or to others. After providing Loyd with a supply of medication and scheduling a followup appointment at Lasting Hope, Benton discharged Loyd at 1:40 p.m. Neither Benton nor Lasting Hope staff notified OPD or Melissa of Loyd's discharge.

After Loyd was discharged, he placed numerous calls to Melissa from his cell phone. Melissa was at home with her sister, who urged Melissa to ignore Loyd's calls. But eventually Melissa answered one. Loyd told her that he had been discharged from Lasting Hope. Melissa agreed to meet Loyd that evening at a park.

Melissa's body was discovered the next day, August 15, 2013. Investigators concluded that Loyd had strangled Melissa. Loyd had returned to Lasting Hope, and OPD officers arrested him there. Loyd was initially prosecuted for murdering Melissa, but in September 2013, he was found not competent to stand trial.

The present action was initiated by the Special Administrators, Melissa's parents, in the district court for Douglas County. According to the amended complaint, parties representing two groups had negligently caused Melissa's wrongful death.

[1] The first group, collectively referred to as the "UNMC Defendants," consisted of UNMC Physicians; the Noll Company; and two employees of UNMC Physicians, "Jane Doe Physician #1" and "Jane Doe Nurse #1." The second group, collectively referred to as the "Lasting Hope Defendants," consisted of Catholic Health Initiatives, doing business as CHI Health; Alegent Health-Bergan Mercy Health System, doing business as Lasting Hope; and two employees of Lasting Hope, "John Doe #1" and "John Doe #2." We note that certain of these entities were grouped together pursuant to the doctrine of respondeat superior, which allows an employer to be held vicariously liable for the negligence of an employee while acting within the scope of employment.[2]

The defendants filed motions to dismiss for failing to state a claim upon which relief can be granted.[3] After a hearing, the district court concluded that the issue raised by the motions to dismiss was whether the defendants owed Melissa a duty. Holding that the Special Administrators had failed to allege sufficient facts to show that the UNMC Defendants or the Lasting Hope Defendants owed Melissa any duty, the district court ordered the complaint dismissed.

We reviewed the Special Administrators' first appeal in *Rodriguez v. Catholic Health Initiatives* (*Rodriguez I*) and reversed the decision of the district court and remanded the cause.[4] The Special Administrators' claim against the UNMC Defendants was sufficient to survive a motion to dismiss based on allegations, which we accepted as true, that Loyd had "'sufficiently communicated'" to Benton that he intended to kill Melissa.[5] And with respect to the Lasting Hope Defendants, the Special Administrators had "alleged sufficient facts . . . ,

---

[2] See *Cruz v. Lopez*, 301 Neb. 531, 919 N.W.2d 479 (2018).

[3] See Neb. Ct. R. Pldg. § 6-1112(b)(6).

[4] *Rodriguez v. Catholic Health Initiatives*, 297 Neb. 1, 899 N.W.2d 227 (2017).

[5] *Id.* at 15, 899 N.W.2d at 237.

which we accept[ed] as true, to show that Loyd was in Lasting Hope's custody and that therefore, such facts g[a]ve rise to a duty."[6]

After our remand and some discovery, the defendants moved for summary judgment. A hearing on defendants' motions was set for Monday, October 7, 2019. On Sunday, the day before the hearing, the Special Administrators served on the defendants six affidavits, 526 pages in all, in opposition to summary judgment. The defendants objected that these affidavits were untimely served, lacked proper foundation, and consisted of hearsay. After taking the matter under advisement, the district court ultimately sustained the defendants' objections, writing in its order that "[t]he material objected to has been ignored by the [c]ourt in its determination herein."

The district court then granted the defendants' motions for summary judgment, concluding that the undisputed evidence showed that none of the defendants owed any duty to Melissa. According to the district court, the UNMC Defendants owed no duty to warn Melissa because Loyd had never actually communicated to Benton that he intended to harm Melissa. And the Lasting Hope Defendants owed no duty to protect Melissa because by the time of her murder, Loyd had already been discharged from Lasting Hope pursuant to Benton's recommendation.

The Special Administrators filed a timely appeal.[7]

## III. ASSIGNMENTS OF ERROR

The Special Administrators assign, consolidated and restated, that the district court erred by (1) granting summary judgment to the UNMC Defendants and the Lasting Hope Defendants on the basis that they did not owe a duty to warn and protect Melissa from Loyd and (2) excluding six affidavits in opposition to the defendants' motions for summary judgment.

---

[6] *Id.* at 12, 899 N.W.2d at 236.

[7] See Neb. Rev. Stat. § 25-1912 (Cum. Supp. 2020).

## IV. STANDARD OF REVIEW

[2,3] An appellate court affirms a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from the facts and that the moving party is entitled to judgment as a matter of law.[8] An appellate court reviews the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.[9]

[4,5] The question whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation.[10] In reviewing questions of law, an appellate court has an obligation to reach conclusions independently of those reached by the trial court.[11]

[6] An appellate court reviews the factual findings underpinning a trial court's evidentiary rulings for clear error and reviews de novo the court's ultimate determination to admit evidence over an objection.[12]

## V. ANALYSIS

As we have stated before, when confronted by an unimaginable loss such as what the Special Administrators have experienced with respect to the life of Melissa, their daughter, it is natural to ask, "What more could have been done?"[13] But tort law requires that we begin with a different question: whether a legal duty existed to do anything more.[14]

---

[8] *Lassalle v. State*, 307 Neb. 221, 948 N.W.2d 725 (2020).

[9] *Id.*

[10] *Sundermann v. Hy-Vee*, 306 Neb. 749, 947 N.W.2d 492 (2020).

[11] See *id.*

[12] See *AVG Partners I v. Genesis Health Clubs*, 307 Neb. 47, 948 N.W.2d 212 (2020).

[13] *Bell v. Grow With Me Childcare & Preschool*, 299 Neb. 136, 146, 907 N.W.2d 705, 713 (2018).

[14] See *id.*

## 1. Duty

[7,8] To recover in a negligence action, a plaintiff must show that the defendant owed a duty to the plaintiff, breached that duty, and caused damages as a result.[15] The threshold issue in any negligence action, and the question presented here, is whether the defendants owed a duty to the plaintiffs.[16] Specifically at issue is the UNMC Defendants' and the Lasting Hope Defendants' duty to warn and protect Melissa. The Special Administrators allege that the defendants' breach of this duty proximately caused Melissa's wrongful death.

Until 2012, when discussing a defendant's duty to control the actions of a third party, we relied on the Restatement (Second) of Torts,[17] which provides that there is generally no duty to control the conduct of a third person to prevent him or her from causing physical harm to another unless "'a special relationship exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct.'"[18] For example, "'[o]ne who takes charge of a third person whom he [or she] knows or should know [is] likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him [or her] from doing such harm.'"[19]

[9] Since 2012, which was after the Restatement (Third) of Torts[20] was published, we have generally relied on it, instead, when considering the duty to control the actions of a third

---

[15] See *Sundermann, supra* note 10, 306 Neb. at 763-64, 947 N.W.2d at 503.

[16] See *id.*

[17] Restatement (Second) of Torts § 315(a) (1965).

[18] *Bartunek v. State*, 266 Neb. 454, 459, 666 N.W.2d 435, 440 (2003) (quoting Restatement (Second), *supra* note 17).

[19] *Id.* at 462, 666 N.W.2d at 441 (quoting Restatement (Second), *supra* note 17, § 319).

[20] See 1 Restatement (Third) of Torts: Liability for Physical and Emotional Harm (2010) and 2 Restatement (Third) of Torts: Liability for Physical and Emotional Harm (2012).

party.[21] It provides similarly that an actor whose conduct has not created a risk of physical harm to another has no duty of care to the other unless an affirmative duty created by another circumstance is applicable.[22] However, "'[a]n actor in a special relationship with another owes a duty of reasonable care to third persons with regard to risks posed by the other that arise within the scope of the relationship.'"[23] Specifically, § 41(b) of the Restatement (Third) identifies four special relationships that give rise to such a duty: "(1) a parent with dependent children, (2) a custodian with those in its custody, (3) an employer with employees when the employment facilitates the employee's causing harm to third parties, and (4) a mental-health professional with patients."[24]

As the parties agree, the special relationship here, if any, was one based on custody. We have never before adopted § 41(b) of the Restatement (Third) recognizing that the relationship between a mental-health professional and patients gives rise to a generalized duty of reasonable care, nor do we do so here.

[10,11] We have twice before recognized that having custody over another person creates a special relationship.[25] In *Rodriguez I*, we adopted § 41(b)(2) of the Restatement (Third) as "consistent with our jurisprudence and prudent."[26] A custodial relationship "need not be 'full-time physical custody giving the custodian complete control over the other person.'"[27] But "to the extent that 'there is some custody and control of a person posing dangers to others, the custodian has an

---

[21] *Ginapp v. City of Bellevue*, 282 Neb. 1027, 809 N.W.2d 487 (2012).

[22] *Id.*

[23] *Id.* at 1034, 809 N.W.2d at 492 (quoting 2 Restatement (Third), *supra* note 20, § 41(a)). See, also, 2 Restatement (Third), *supra* note 20, § 37.

[24] 2 Restatement (Third), *supra* note 20, § 41(b) at 65.

[25] See, *Rodriguez I, supra* note 4; *Ginapp, supra* note 21.

[26] *Rodriguez I, supra* note 4, 297 Neb. at 12, 899 N.W.2d at 236.

[27] *Id.* (quoting 2 Restatement (Third), *supra* note 20, § 41, comment *f.*).

affirmative duty to exercise reasonable care, consistent with the extent of custody and control.'"[28]

Based on this rule of duty in a custodial special relationship, we concluded in *Rodriguez I* that the Special Administrators had alleged sufficient facts to survive a motion to dismiss. In *Rodriguez I*, on review of the district court's order granting dismissal, we accepted as true the Special Administrators' allegations in the amended complaint that Loyd was admitted to Lasting Hope on August 8, 2013, under emergency protective custody; held involuntarily there for 6 days, during which Loyd sufficiently communicated to Benton threats of physical violence against Melissa; and allowed to "le[ave] Lasting Hope on his own, without supervision, being questioned or stopped, and without Lasting Hope even noticing he was gone." If facts supported these allegations, we found that such facts could have given rise to the defendants' duty to warn and protect Melissa from Loyd.

After this court's remand and some discovery, however, the district court granted summary judgment to the UNMC Defendants and the Lasting Hope Defendants. The district court found uncontroverted evidence that rebutted two of the Special Administrators' essential allegations in the amended complaint. Specifically, the district court held first that because Loyd had never communicated to Benton or other Lasting Hope staff that he intended to harm Melissa, no duty to warn her could arise. Second, the district court held that because, by the time of Melissa's murder, Loyd had been discharged from Lasting Hope "pursuant to the opinion of [Benton,] a qualified psychiatrist," any custodial duty to protect Melissa had terminated. We review each holding in turn.

### (a) Duty to Warn

The Special Administrators' first argument against summary judgment concerns the very language of this court's

---

[28] *Id.*

precedent. They concede that the facts do not support their allegation in the amended complaint that Loyd actually communicated to Benton any intent to harm Melissa. Yet, the Special Administrators invite us to "reconsider" whether such actual communication is necessary.[29] They contend that reconsideration of this requirement would allow this court to "depart from the current narrow and punitive application that liability for failure to warn can only exists [sic] if the eventual assailant or murder[er] directly so states their future plans of murder or mayhem to their psychiatrist or mental health provider."[30]

We determined the extent of psychiatrists' duty to warn and protect third-party victims from their patients in *Munstermann v. Alegent Health.*[31] There, the family of a woman murdered by her boyfriend sued the hospital and psychiatrist that had treated the boyfriend in inpatient care. The family alleged that the psychiatrist had proximately caused the woman's death by failing to take reasonable measures to warn and protect her from the boyfriend's violent behavior and homicidal ideation. The jury was instructed that this was an action based upon a claim of malpractice and that the question was whether the defendants had exercised reasonable care consistent with the circumstances to protect third parties from the boyfriend in inpatient treatment.

But we specifically found that those jury instructions were inconsistent with principles set forth by our Legislature.[32] We noted that although no statute explicitly addressed the duty of psychiatrists to warn and protect, other statutes addressed such duty for mental health professionals and psychologists, respectively.[33] Namely, the Mental Health Practice Act[34] and

---

[29] Brief for appellants at 25.

[30] *Id.*

[31] *Munstermann v. Alegent Health*, 271 Neb. 834, 716 N.W.2d 73 (2006).

[32] *Id.*

[33] *Id.*

[34] See Neb. Rev. Stat. §§ 38-2102 to 38-2139 (Reissue 2016 & Cum. Supp. 2020).

the Psychology Practice Act[35] each contain limits on their duty in connection with treating patients with mental illness.

These limits were statutorily enacted in response to the California Supreme Court's decision in *Tarasoff v. Regents of University of California*,[36] which held that a psychotherapist who knows or should know that a patient poses a serious danger of violence to a third party owes a duty to exercise reasonable care to warn and protect that third party. According to *Tarasoff*, a therapist's relationship with a patient affords the therapist control and authority over the patient in a way that closely resembles a custodian's control and authority over a person in custody. This special relationship thus requires the therapist to exercise reasonable care, depending on the circumstances, toward potential third-party victims of the patient.[37] For example, if the identity of a patient's potential victim is known, reasonable care might require the therapist to, at least, warn the victim; but if no victim is reasonably identifiable, reasonable care might require the therapist to take other protective precautions, such as maintaining or asserting custody over the patient or warning law enforcement or other appropriate officials of the danger.[38]

Like legislatures in many other states, the Nebraska Legislature moved quickly after *Tarasoff* to circumvent a similarly sweeping rule in Nebraska and, instead, to restrict therapists' duty to warn and protect potential victims of patients' experiencing mental illness.[39] Sections 38-2137(1) and 38-3132(1) limited liability for any mental health practitioner

---

[35] See Neb. Rev. Stat. §§ 38-3101 to 38-3133 (Reissue 2016 & Cum. Supp. 2020).

[36] *Tarasoff v. Regents of University of California*, 17 Cal. 3d 425, 551 P.2d 334, 131 Cal. Rptr. 14 (1976).

[37] See *id.*

[38] See *id.* See, also, John G. Fleming & Bruce Maximov, *The Patient or His Victim: The Therapist's Dilemma*, 62 Cal. L. Rev. 1025 (1974).

[39] See *Munstermann, supra* note 31.

or psychologist whose patient communicated to him or her a serious threat of physical violence against himself, herself, or another reasonably identifiable victim.[40]

[12] In *Munstermann*, we concluded that although neither of these statutes explicitly addressed the potential liability of psychiatrists, there was no rational basis for the Legislature to have intended a psychiatrist's duty to be bound by a different standard. Thus, under the *Munstermann* rule:

> [A] psychiatrist is liable for failing to warn of and protect from a patient's threatened violent behavior, or failing to predict and warn of and protect from a patient's violent behavior, when the patient has communicated to the psychiatrist a serious threat of physical violence against himself, herself, or a reasonably identifiable victim or victims. The duty to warn of or to take reasonable precautions to provide protection from violent behavior shall arise only under those limited circumstances . . . and shall be discharged by the psychiatrist if reasonable efforts are made to communicate the threat to the victim or victims and to a law enforcement agency.[41]

[13] Where a statute has been judicially construed and that construction has not evoked an amendment, it will be presumed that the Legislature has acquiesced in the court's determination of the Legislature's intent.[42] By now, more than 14 years have passed since our decision in *Munstermann*, and in that time, the Legislature has not amended either of the statutes on which the *Munstermann* rule is based.[43] Nor has the Legislature adopted an alternative duty of psychiatrists to warn and protect third parties from the psychiatrists' patients. As such, we view the *Munstermann* rule as having received legislative acquiescence.

---

[40] See *id.*

[41] *Id.* at 847, 716 N.W.2d at 85.

[42] *Drought v. Marsh*, 304 Neb. 860, 937 N.W.2d 229 (2020).

[43] See §§ 38-2137(1) and 38-3132(1).

[14,15] Since *Munstermann*, we have clarified that certain language in the *Munstermann* rule is critical to properly limit psychiatrists' duty to third parties. "'[A] duty to warn and protect arises *only if* the information communicated to the psychiatrist leads the psychiatrist to believe that his or her patient poses a serious risk of grave bodily injury to another.'"[44] As a result, the "'question is whether a serious threat of physical harm was *actually "communicated"* to the psychiatrist.'"[45]

Because we do not find this line of cases to be in error, we reject the Special Administrators' invitation to reconsider our requirement of actual communication. The *Munstermann* rule is based on two statutes, duly enacted by the Nebraska Legislature. Like the *Munstermann* rule, both statutes explicitly require that for a duty to warn to arise, a serious threat of physical violence against a reasonably identifiable victim be "communicated" to a psychologist or mental health practitioner[46] To negate the requirement that a threat actually be communicated to a psychiatrist would undermine the statutes on which the *Munstermann* rule is based.

Moreover, the statutes on which *Munstermann* is based were drafted to reflect the Legislature's reasoned policy judgment. The language in §§ 38-2137(1) and 38-3132(1) represents the Legislature's effort to strike the appropriate balance between assuring patients that what they disclose to a mental health care provider will be held in confidence and protecting the safety of third parties the patient intends to harm.[47] "In other words, the statutory language is the result of [the Legislature's] balancing risk and utility, considering the magnitude of the risk, relationship of the parties, nature of the risk, opportunity and ability to exercise care, foreseeability of the harm, and

---

[44] *Rodriguez I, supra* note 4, 297 Neb. at 18, 899 N.W.2d at 239 (quoting *Munstermann, supra* note 31) (emphasis supplied).

[45] *Id.*

[46] See §§ 38-2137(1) and 38-3132(1).

[47] See *Munstermann, supra* note 31.

public policy interest in the proposed solution."[48] Because these policy factors weighed equally for psychologists and mental health practitioners as for psychiatrists, we found in *Munstermann* that "[t]he Legislature has made a public policy determination with respect to the *Tarasoff* duty that this court is bound to respect" and apply to psychiatrists, as well.[49]

[16] We """"proceed cautiously"""" when our decision would undermine a policy judgment of the Legislature, our coequal branch.[50] And the Special Administrators have failed to show that it would be proper to depart from the Legislature's reasoned judgment here. Accordingly, we decline to do so.

[17] Applying our precedent, we agree with the district court's analysis of the defendants' duty to warn. As the district court found, the *Munstermann* rule requires actual communication.[51] The term "actual communication" is not defined by statutes. In this context, we construe its plain text to mean that the patient must verbally express or convey to the psychiatrist his or her prediction to commit physical violence against himself, herself, or a reasonably identifiable victim or victims.[52]

Here, it is uncontroverted that Loyd never actually communicated to Benton that he intended to harm Melissa. We noted in *Rodriguez I* that if the Special Administrators' claim were supported by facts that Loyd had communicated to Benton a serious threat of physical violence against Melissa, those facts could give rise to a duty to warn.[53] But the undisputed facts now in the record do not support that allegation.

Indeed, the only reasonably identifiable victim whom Loyd conveyed an intent to physically harm was his mother.

---

[48] *Id.* at 847, 716 N.W.2d at 84.

[49] *Id.* at 846, 716 N.W.2d at 84. See, *Tarasoff, supra* note 36.

[50] *State ex rel. Veskrna v. Steel*, 296 Neb. 581, 599, 894 N.W.2d 788, 801 (2017).

[51] *Rodriguez I, supra* note 4.

[52] See *Fredericks v. Jonsson*, 609 F.3d 1096 (10th Cir. 2010).

[53] See *Rodriguez I, supra* note 4.

During Benton's evaluations, Loyd specifically expressed an intention to kill his mother in retaliation for his father's death. Based on these verbal expressions of threats, Benton ordered Lasting Hope staff to call Loyd's mother to warn her. And by the time Benton had ordered Loyd's discharge, she knew that OPD was aware of Loyd's threats of physical violence against his mother, because Lasting Hope staff had discussed the threats with OPD officers, who also warned Loyd's mother.

As the Special Administrators now concede, Loyd never expressed to Benton or anyone else at Lasting Hope that he intended to harm Melissa. He never identified Melissa by name or even by description in connection with his expression of homicidal ideation. And to the extent that the outstanding arrest warrant identified Melissa as the victim of Loyd's past misconduct, it did not amount to an actual communication by Loyd, nor did it predict that he would commit physical violence against Melissa in the future. As a result, no duty to warn Melissa was triggered under *Munstermann*.[54]

The Special Administrators have failed to raise a dispute about whether Loyd actually communicated to Benton that he wished to physically harm Melissa. Instead, the record supports the UNMC Defendants' and the Lasting Hope Defendants' argument for summary judgment that he did not. Accordingly, we affirm the decision of the district court to grant summary judgment for the defendants on the issue of duty to warn.

### (b) Duty to Protect

As to the issue of duty to protect, the district court granted summary judgment to the defendants by reasoning that to the extent that they were Loyd's custodians, they did not breach their duty of reasonable care toward Melissa. The district court reached this conclusion based on undisputed facts that at the time of Melissa's murder, Loyd had already been discharged "pursuant to the opinion of [Benton,] a qualified psychiatrist." Given that any custodianship over Loyd had

---

[54] See *Munstermann, supra* note 31.

thus terminated, the district court held that no new duty of reasonable care could arise to require Benton and Lasting Hope to protect Melissa, a third party. Accordingly, summary judgment was granted for the defendants on the issue of duty to protect.

In arguing that summary judgment on this issue was in error, the Special Administrators allege that the district court viewed the relevant time period too narrowly. According to the Special Administrators, instead of focusing only on the period directly before Melissa's death, the district court should have found that the defendants were negligent because of their actions and omissions before Loyd was discharged. The Special Administrators cite the testimony of Dr. Bruce Gutnik that in his medical judgment, Benton's order to discharge Loyd was premature. The defendants dispute that Loyd was ever in Lasting Hope's custody because, they claim, he remained there voluntarily. Based on this factual dispute, the Special Administrators contend that summary judgment was inappropriate.

We agree that the question of whether Loyd was ever in Lasting Hope's custody for purposes of the special relationship under the Restatement (Third), § 41(b)(2),[55] is a genuine factual dispute here.[56] But we disagree that it is material to the disposition of this case.

[18] In the summary judgment context, a fact is material only if it would affect the outcome of the case.[57] But here, even assuming arguendo that Loyd was in Lasting Hope's custody while he was a patient there, the undisputed facts show that Melissa's death cannot be legally attributed to a breach of duty by the defendants. We concur with the decision of the district court to grant summary judgment to the defendants, although we reach this decision not based on a lack of

---

[55] See 2 Restatement (Third), *supra* note 20, § 41(b)(2).

[56] See *Wintroub v. Nationstar Mortgage*, 303 Neb. 15, 927 N.W.2d 19 (2019).

[57] *Pitts v. Genie Indus.*, 302 Neb. 88, 921 N.W.2d 597 (2019).

custody but instead because Loyd did not communicate to the defendants that he intended to physically injure Melissa.

[19-21] As we stated above, our common law generally imposes on actors an affirmative duty, to the extent of their custody over another person, to protect third parties from the person in custody.[58] This common-law duty requires the actor to exercise reasonable care consistent with the extent of custody and control.[59] We ask, what would a reasonable person of ordinary prudence have done in the same or similar circumstances?[60] Where reasonable minds can disagree about whether reasonable care was followed, we generally leave the question to the jury.[61]

[22] But sometimes reasonable minds cannot disagree about whether an actor exercised reasonable care. When an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases, a court may decide that, as a matter of law, the defendant has no duty or that the ordinary duty of reasonable care requires modification.[62]

[23,24] A determination of no duty as a matter of law should be grounded in public policy and based upon legislative facts, not adjudicative facts arising out of the particular circumstances of the case.[63] And such determination should be explained and justified based on articulated policies or principles that justify exempting the actor from liability or modifying the ordinary duty of reasonable care.[64]

---

[58] See *Rodriguez I, supra* note 4.

[59] See *id.*

[60] See *id.*

[61] See *Reiber v. County of Gage*, 303 Neb. 325, 928 N.W.2d 916 (2019). See, also, 1 Restatement (Third), *supra* note 20, § 8.

[62] *McReynolds v. RIU Resorts & Hotels*, 293 Neb. 345, 880 N.W.2d 43 (2016). See, also, 1 Restatement (Third), *supra* note 20, § 7(b).

[63] See *McReynolds, supra* note 62.

[64] *Kimminau v. City of Hastings*, 291 Neb. 133, 864 N.W.2d 399 (2015). See, also, 1 Restatement (Third), *supra* note 20, § 7, comment *j.*

Here, there is such a countervailing policy to warrant a finding that, as a matter of law, no duty to protect was triggered. As analyzed above, the first duty implicated by *Munstermann* is the psychiatrist's duty to warn.[65] But by its plain language, the *Munstermann* rule applies equally to the psychiatrist's duty to protect.

In each clause of the *Munstermann* rule that limits psychiatrists' duty to warn, there is an equal limitation on their duty to protect. For example, psychiatrists' liability is limited for "failing to warn of *and protect from* a patient's threatened violent behavior, or failing to predict and warn of *and protect from* a patient's violent behavior" unless the patient has communicated to the psychiatrist a serious threat of physical harm.[66] And "[t]he duty to warn of *or take reasonable precautions to provide protection from* violent behavior shall arise only under those limited circumstances . . . ."[67] To the extent that any duty to warn and protect does arise, it "shall be discharged by the psychiatrist if reasonable efforts are made to communicate the threat to the victim or victims and to a law enforcement agency."[68]

As recounted above, with the Legislature's acquiescence, we adapted these statements in the *Munstermann* rule directly from the Legislature's identical limitations on mental health practitioners' and psychologists' liability.[69] The Legislature explicitly enacted these limitations in response to *Tarasoff* and, with them, fashioned a state policy "to preempt an expansive ruling [in Nebraska] that a therapist can be held liable for the mere failure to predict potential violence by his or her

---

[65] See *Munstermann, supra* note 31.

[66] *Munstermann, supra* note 31, 271 Neb. at 847, 716 N.W.2d at 85 (emphasis supplied).

[67] *Id.* (emphasis supplied).

[68] *Id.*

[69] See §§ 38-2137(1) and 38-3132(1).

patient."[70] Just as failure to warn claims are premised in part on psychiatrists' duty to predict their patients' future violence, so too are failure to protect claims. Accordingly, we view the *Munstermann* rule as an accurate determination of state policy with respect to the duty of psychiatrists to warn—and protect—third parties from their patients' violent behavior.

Our survey of other jurisdictions indicates that we are far from alone in applying a limiting rule to the duty to warn and protect in this way. Except for those jurisdictions that have specifically stated in court rule[71] or statute[72] that the duties to warn and protect should be disengaged from each other and analyzed separately, most jurisdictions have opted to analyze the duty to warn and protect as one, like *Tarasoff* did.[73] For example, the legislatures in both Louisiana and Michigan codified statutes nearly identical to the *Munstermann* rule,[74] and appellate courts have interpreted the statutes to foreclose the liability of therapists for failing to warn and protect third parties from patients unless a patient has communicated to the therapist a reasonably identifiable victim.[75]

[25] Likewise, in accord with this state's determination of policy set forth in *Munstermann*, we apply a rule of no duty

---

[70] *Munstermann, supra* note 31, 271 Neb. at 846, 716 N.W.2d at 84 (citing *Ewing v. Goldstein*, 120 Cal. App. 4th 807, 15 Cal. Rptr. 3d 864 (2004)). See *Tarasoff, supra* note 36.

[71] See, e.g., *Texas Home Management, Inc. v. Peavy*, 89 S.W.3d 30 (Tex. 2002).

[72] See, e.g., Paul S. Appelbaum et al., *Statutory Approaches to Limiting Psychiatrists' Liability for Their Patients' Violent Acts*, 146 Am. J. Psychiatry 821 (1989) (citing the American Psychiatric Association's model statute).

[73] See Alan R. Felthous & Claudia Kachigan, *To Warn and to Control: Two Distinct Legal Obligations or Variations of a Single Duty to Protect?* 19 Behav. Sci. & L. 355 (2001). See, also, *Tarasoff, supra* note 36.

[74] See, La. Stat. Ann. § 9:2800.2 (2018); Mich. Comp. Laws Ann. § 330.1946 (West 1999).

[75] See, e.g., *Hines v. Bick*, 566 So. 2d 455 (La. App. 1990); *Swan v. Wedgwood Family Services*, 230 Mich. App. 190, 583 N.W.2d 719 (1998).

as a matter of law to limit a psychiatrist's liability for failing to warn or protect third parties injured by a patient.[76] Under our decision in *Munstermann*, psychiatrists owe no duty as a mater of law to third parties for physical injuries caused by a patient who has not actually communicated a threat of physical violence. And once such an actual communication has taken place, any duty to warn or protect on the part of the psychiatrist can be discharged by reasonable efforts to communicate the threat to the victim and a law enforcement agency.[77]

Here, the Special Administrators rightly frame their claim as one based on the defendants' duty to protect Melissa, a third party, from Loyd. Specifically, they allege that the defendants failed to protect her by failing to turn Loyd over to OPD on August 12, 2013, and by prematurely discharging Loyd from Lasting Hope on August 14 without notifying OPD and Melissa.

As the undisputed facts show, both of these alleged breaches of duty are attributable to the actions or omissions of Benton. She was "ultimately responsible" for Loyd's treatment and discharge.[78] As Loyd's treating psychiatrist, Benton conducted the initial intake evaluation of Loyd and determined that he needed to be hospitalized at Lasting Hope for 5 to 7 days. Based on the initial evaluation, she then determined that despite Loyd's attempt to turn himself in to OPD on August 12, 2013, he needed further treatment and was not yet ready to be discharged from Lasting Hope. She communicated this to OPD officers via Lasting Hope staff, who merely relayed her determination. The OPD officers then left Lasting Hope without arresting Loyd, apparently accepting Benton's psychiatric determination of Loyd's condition.

On August 14, 2013, as well, it was because of Benton's order as Loyd's treating psychiatrist that Loyd was discharged. Even if, as the Special Administrators allege, Lasting

---

[76] See *Munstermann, supra* note 31.

[77] *Id.*

[78] See *Wilson v. Valley Mental Health*, 969 P.2d 416, 420 (Utah 1998).

Hope staff had failed on August 12 to document OPD's request to arrest Loyd upon his discharge, it is undisputed that Benton knew of Loyd's outstanding arrest warrant. Still, based on her medical judgment, Benton determined that Loyd no longer posed a risk to himself or others and ordered him discharged to the public. The order to discharge Loyd was solely Benton's.

In this way, the uncontroverted facts show that Benton made both of the decisions that the Special Administrators allege allowed Loyd to be able to murder Melissa. Benton made these decisions via the authority delegated to her as Lasting Hope's agent and UNMC Physicians' employee.[79] As the undisputed facts show, the UNMC Defendants and the Lasting Hope Defendants did not negligently hire, train, or otherwise delegate authority to Benton to treat Loyd, nor are these claims specifically assigned in the Special Administrators' briefs. The failure to protect claim is entirely based on the alleged duty and breach of Benton, a psychiatrist, to protect Melissa, a third party, from Benton's patient, Loyd. Accordingly, given these undisputed facts now before us, we hold that the Special Administrators' claim is controlled by the *Munstermann* rule, not by the Restatement (Third), § 41, duty of reasonable care.[80]

In *Rodriguez I*, we assumed that the Special Administrators' allegations in the amended complaint were all true, including the allegation that Loyd had "'sufficiently communicated'" to Benton and Lasting Hope staff threats of violence against Melissa.[81] If that allegation were supported by facts, we found that those facts could have given rise to a duty on the part of the defendants to warn and protect Melissa.[82] We

---

[79] See *RM Campbell Indus. v. Midwest Renewable Energy*, 294 Neb. 326, 886 N.W.2d 240 (2016).

[80] See, *Munstermann, supra* note 31; 2 Restatement (Third), *supra* note 20, § 41.

[81] See *Rodriguez I, supra* note 4, 297 Neb. at 15, 899 N.W.2d at 237.

[82] See *Rodriguez I, supra* note 4.

affirm that analysis here and add that any defendant to whom Loyd had actually communicated a threat of physical violence against Melissa could have discharged the *Munstermann* duty to warn and protect by notifying Melissa and a law enforcement agency of the threat.[83]

But, as analyzed above, the uncontroverted evidence in the record shows that Loyd's lack of communicated threats against Melissa meant that no duty to warn or protect was triggered for the defendants. Despite the Special Administrators' allegations in the amended complaint, they have failed to offer any evidence that Loyd actually communicated to Benton or other Lasting Hope staff that he wished to commit physical violence against Melissa. As a result, under the *Munstermann* rule, the Special Administrators' duty to protect claim fails as a matter of law.

We concur with the decision of the district court to grant the defendants' motions for summary judgment on the Special Administrators' duty to protect claim. The undisputed facts show that Melissa's death is not legally attributable to a breach of duty by the UNMC Defendants or the Lasting Hope Defendants, because Loyd never actually communicated to them that he intended to harm Melissa. The Special Administrators' first assignment of error is without merit.

## 2. EXCLUSION OF AFFIDAVITS

The Special Administrators' second assignment of error is that the district court wrongfully excluded their affidavits in opposition to the defendants' motions for summary judgment.

Under Neb. Rev. Stat. § 25-1332 (Cum. Supp. 2020), after a motion for summary judgment has been filed, "[t]he adverse party prior to the day of hearing may serve opposing affidavits."[84] In opposition to the defendants' motions for summary judgment scheduled for a hearing on Monday, October 7, 2019, the Special Administrators served six

---

[83] See *Munstermann, supra* note 31.

[84] See *Woodhouse Ford v. Laflan*, 268 Neb. 722, 687 N.W.2d 672 (2004).

affidavits on Sunday, October 6. Thus, under the plain text of § 25-1332, the Special Administrators claim, it was error for the district court to exclude the affidavits, served the day prior to hearing, as untimely.

[26,27] We need not decide whether the district court erred in excluding the Special Administrators' affidavits because, even assuming arguendo that the district court did err, such error would not be reversible error. The admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party.[85] Erroneous exclusion of evidence does not require reversal if the evidence would have been cumulative and other relevant evidence, properly admitted, supports the trial court's finding.[86]

Here, besides the six affidavits offered by the Special Administrators, 18 other exhibits supported the defendants' motions for summary judgment. A review of the Special Administrators' six affidavits reveals that they would not have presented disputes of material fact. They are largely cumulative. They consist of 526 pages of witness statements commenting on Loyd's mental health and his actions during and after his stay at Lasting Hope. To the extent that the affidavits contain noncumulative evidence, such as expert testimony and a report from Gutnik and an affidavit from Loyd, we have reviewed that evidence and find that it does not dispute the issues of material fact discussed above in this opinion.

Because the Special Administrators fail to show prejudice, a prerequisite for reversible error, their second assignment of error is without merit.

## VI. CONCLUSION

Melissa's death was a tragedy, and we recognize that the outcome we reach today may seem harsh to the Special Administrators. But our review of the undisputed evidence in the record has found no grounds on which Melissa's death

---

[85] See *AVG Partners I, supra* note 12.

[86] See *id.*

can be legally attributed to any duty owed by these defendants. Therefore, we concur with the decision of the district court to deny relief to the Special Administrators.

The district court's order granting the defendants' motions for summary judgment is affirmed.

AFFIRMED.

FUNKE, J., not participating.

PAPIK, J., concurring.

The majority opinion finds that defendants are entitled to summary judgment because each of the allegedly negligent acts was committed by Dr. Benton, a psychiatrist; because in *Munstermann v. Alegent Health*, 271 Neb. 834, 716 N.W.2d 73 (2006), we held that a psychiatrist's duty to take precautions with respect to potentially dangerous patients is triggered only in limited circumstances; and because there is no evidence those circumstances were present here. I agree with the majority that the rule we adopted in *Munstermann* stands as a barrier to the Special Administrators' claims in this case, but I write separately to express my reservations about the analysis the court used to arrive at its holding in *Munstermann*.

The suit in *Munstermann* arose out of a psychiatric patient's murder of his estranged girlfriend. The personal representative of the victim's estate brought suit against a psychiatrist who had seen the patient shortly before the murder and against the hospital at which the psychiatrist worked. Notes regarding the psychiatrist's observation of the patient indicated that the patient "'was thinking of hurting [his] girlfriend . . . since she is hurting him.'" *Id.* at 837, 716 N.W.2d at 78. After the jury was unable to reach a verdict and the district court declared a mistrial, the defendants unsuccessfully moved for judgment notwithstanding the verdict and then appealed.

The threshold issue on appeal was whether and to what extent the defendants owed the victim a legal duty. Identifying such a duty and defining the scope thereof was crucial because of the general tort rule that, in the absence of certain carefully

defined special relationships, there is no duty to prevent a third party from causing harm to another. See Restatement (Second) of Torts, § 315(a) (1965). See, also, *Bell v. Grow With Me Childcare & Preschool*, 299 Neb. 136, 907 N.W.2d 705 (2018).

In our duty analysis in *Munstermann*, we extensively discussed two statutes. One provided that licensed mental health practitioners (a category defined by statute to exclude psychiatrists and other physicians) could be held liable for failing to warn and provide protection from a patient's threatened violent behavior "when the patient has communicated to the mental health practitioner a serious threat of physical violence against himself, herself, or a reasonably identifiable victim or victims," but that there was no duty to warn or protect in any other circumstances. Neb. Rev. Stat. § 71-1,336 (Reissue 2003). The same statute provided that the duty described could be discharged if the practitioner made reasonable efforts to communicate the threat to the victim or victims and to a law enforcement agency. *Id.* The other statute, Neb. Rev. Stat. § 71-1,206.30 (Reissue 1996), provided that essentially the same rules applied to psychologists.

We acknowledged that the statutes governing the duties of licensed mental health practitioners and psychologists did not apply to psychiatrists and that a psychiatrist's duty was thus "still controlled by common law." *Munstermann v. Alegent Health*, 271 Neb. 834, 845, 716 N.W.2d 73, 83 (2006). We went on to say, however, that while those statutes "'may not be literally applicable, [they are] clearly indicative of legislatively approved public policy.'" *Id.* at 846, 716 N.W.2d at 84 (quoting *Parson v. Chizek*, 201 Neb. 754, 272 N.W.2d 48 (1978)). We then concluded that because the Legislature had made a public policy determination in these statutes that licensed mental health practitioners and psychologists should have a duty to warn and protect third parties from potentially violent patients but only in limited circumstances, psychiatrists should have the same limited duty. Accordingly, we held that the limited

duties governing licensed mental health practitioners and psychologists also applied to psychiatrists:

> We hold, in accord with §§ 71-1,1206.30(1) and 71-1,336, that a psychiatrist is liable for failing to warn of and protect from a patient's threatened violent behavior, or failing to predict and warn of and protect from a patient's violent behavior, when the patient has communicated to the psychiatrist a serious threat of physical violence against himself, herself, or a reasonably identifiable victim or victims. The duty to warn of or to take reasonable precautions to provide protection from violent behavior shall arise only under those limited circumstances, and shall be discharged by the psychiatrist if reasonable efforts are made to communicate the threat to the victim or victims and to a law enforcement agency.

*Munstermann*, 271 Neb. at 847, 716 N.W.2d at 85.

We seem to have concluded in *Munstermann* that the specific statutes the Legislature enacted concerning licensed mental health practitioners and psychologists demonstrated that the Legislature was generally in favor of limited duties to warn and protect for all professionals who assist individuals with mental health issues or at least all professionals sufficiently similar to licensed mental health practitioners and psychologists. We thus applied those limited duties to psychiatrists as well.

I question this approach. Specifically, I question whether it is appropriate for a court to find that the text of a statute does not apply to a particular subject or circumstance, but that the statute nonetheless expresses a generalized public policy the court should strive to recognize as legally applicable to that subject or circumstance.

I concede that this mode of analysis—identifying a general public policy or legislative purpose from a statute and then applying that policy or purpose more broadly than the statutory text itself—was once not uncommon as a method of statutory interpretation. A late-19th-century U.S. Supreme Court case, *Holy Trinity Church v. United States*, 143 U.S. 457, 12

S. Ct. 511, 36 L. Ed 226 (1892), is often cited as emblematic of the approach of that era. See, e.g., Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts (2012); Amy Coney Barrett, *Congressional Insiders and Outsiders*, 84 U. Chi. L. Rev. 2193 (2017); John F. Manning, *Second-Generation Textualism*, 98 Cal. L. Rev. 1287 (2010).

In *Holy Trinity Church*, a statute prohibited assisting or encouraging the importation of foreign nationals "'to perform labor or service of any kind in the United States.'" 143 U.S. at 458. The question presented was whether the statute applied when a church paid for a man from England to come to New York to serve as its pastor. Another section of the statute provided specific exceptions for "professional actors, artists, lecturers, singers and domestic servants." *Id.*, 143 U.S. at 458-59. Although the Court concluded that the transportation of the pastor was covered by the broad prohibition and did not fall within any of the specific exceptions, it nonetheless held the statute did not apply. Based on a number of considerations, including the legislative history and title of the statute, the Court found that the purpose of the statute was to prohibit only the importation of manual labor. The Court described its rationale this way: "[A] thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers." *Id.*, 143 U.S. at 459.

More recently, the *Holy Trinity Church* approach has come under criticism and fallen out of favor. See, e.g., Scalia & Garner, *supra* at 12 ("*Holy Trinity* is a decision that the Supreme Court stopped relying on more than two decades ago"); Barrett, *supra*, 84 U. Chi. L. Rev. at 2195 ("[t]he claim that it is permissible to depart from clear text in the service of congressional purpose—an approach epitomized by *Church of the Holy Trinity v. United States*—has fallen into disrepute"); Abbe R. Gluck, *Imperfect Statutes, Imperfect Courts: Understanding Congress's Plan in the Era of Unorthodox Lawmaking*, 129 Harv. L. Rev. 62, 90 (2015) ("*Church of*

*the Holy Trinity v. United States*—oft-maligned for its statement that statutory 'spirit' may trump the plain 'letter of the statute'—is long since dead"); Manning, *supra*, 98 Cal. L. Rev. at 1313 (opining that *Holy Trinity Church* no longer falls within "the mainstream of the [U.S. Supreme] Court's jurisprudence").

In my view, the *Holy Trinity Church* approach is difficult to defend. It is undoubtedly true that statutes are passed to achieve policies and purposes. They do so, however, through legislatively selected means. And if a court can identify and enforce what it believes to be the general policy behind legislation rather than the details actually enacted in the text, it is selecting its own means rather than respecting those chosen by the legislative branch. See, e.g., *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218, 231 n.4, 114 S. Ct. 2223, 129 L. Ed. 2d 182 (1994) (observing that courts are "bound, not only by the ultimate purposes [a legislature] has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes"); Frank H. Easterbrook, *Statutes' Domains*, 50 U. Chi. L. Rev. 533 (1983) (arguing that adherence to text respects legislative choice of means).

The elevation of a judicially recognized general policy over specifically enacted legislative text is particularly problematic because legislation is often the product of compromise. If courts brush aside the details of the text in favor of what they believe to be the general purpose of the legislation, prior compromises will be disrespected and future compromises will be more difficult to reach. See *Henson v. Santander Consumer USA Inc.*, ___ U.S. ___, 137 S. Ct. 1718, 1725, 198 L. Ed. 2d 177 (2017) (quoting *Rodriguez v. United States*, 480 U.S. 522, 107 S. Ct. 1391, 94 L. Ed. 2d 533 (1987) (concluding it is mistaken to assume that anything that furthers "'statute's primary objective must be the law'" because "[l]egislation is, after all, the art of compromise, the limitations expressed in statutory terms often the price of passage . . ."); John F. Manning, *What Divides Textualists From Purposivists*,

106 Colum. L. Rev. 70, 96 (2006) (arguing that judicial adherence to semantic text "is essential if one wishes legislators to be able to strike reliable bargains").

These considerations and others lead me to question our conclusion in *Munstermann v. Alegent Health*, 271 Neb. 834, 716 N.W.2d 73 (2006), that there was a legislatively approved policy requiring that psychiatrists have the same limited duty to warn and protect that the Legislature applied to other professionals via specific statutes. The Legislature did enact limited duties for some professionals, but whatever policy it hoped to achieve through those statutes, they *did not cover* psychiatrists. Perhaps that decision was intentional. Perhaps it was inadvertent. In either case, I do not understand the basis on which we could conclude that the Legislature had directed that psychiatrists have the same duty as these other professionals. If anything, it seems to me one of our oft-used principles of statutory interpretation would counsel in favor of the opposite conclusion. See *Rogers v. Jack's Supper Club*, 304 Neb. 605, 612, 935 N.W.2d 754, 761 (2019) ("[i]t is not within the province of the courts to read meaning into a statute that is not there or to read anything direct and plain out of a statute"). See, also, Scalia & Garner, *supra* at 93 (discussing "Omitted-Case Canon" requiring that matters not covered by a statute are to be treated as not covered).

To be clear, I recognize that *Munstermann* did not find that the statutes covering licensed mental health practitioners and psychologists literally extended to psychiatrists, but, rather, concluded those statutes should apply to psychiatrists in the course of determining psychiatrists' common-law duties. I see little difference, however, between finding that the meaning of a statute goes beyond its text in the course of interpreting a statute and finding that a legislatively approved public policy can be found in a statute not applicable to the subject at hand in the course of common-law analysis.

But while I have reservations about the path we took to arrive at our holding in *Munstermann*, we have continued to

rely on that holding in subsequent cases, no party in this case asks us to reconsider the portion of the decision extending the limited duties applicable to licensed mental health practitioners and psychologists to psychiatrists, and, if such an argument were made, it would have to reckon with the doctrine of legislative acquiescence. I also do not disagree with the majority's conclusion that the Special Administrators' theory of liability is inconsistent with the rule adopted in *Munstermann*, and thus, I concur in the decision affirming summary judgment. For the reasons set forth herein, however, I would be reluctant in a future case to conclude that a statute is indicative of a legislatively approved public policy on a given subject if the text of that statute does not apply to that subject.

STACY, J., joins.